**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| In Re: | ) | |
| | ) | |
| HOPKINS FABRICATION, LLC, | ) | Case No.  3:20-cv-267 (CSH) |
| | ) | |
| Debtor. | ) | **APRIL 26, 2022** |
| | ) | |

## RULING ON APPEAL FROM BANKRUPTCY COURT

**HAIGHT, Senior District Judge:**

This is an appeal by the Debtor, Hopkins Fabrication, LLC ("Debtor Hopkins"), and two creditors, Donald Hopkins and Kirk D. Tavtigian, (collectively "Appellants") from two orders issued by Bankruptcy Judge Julie A. Manning ("Judge Manning") in an action (the "Bankruptcy Proceeding") before the United States Bankruptcy Court for the District of Connecticut (the "Bankruptcy Court").  The first order (the "February 7, 2020 Order Overruling Objection") issued on February 7, 2020.  Doc. 1-1; *see also In re Hopkins Fabrication, LLC*, No. 18-21913, 2020 WL 609594, at *1 (Bankr. D. Conn. 2020).  The second order (the "February 20, 2020 Order Denying Reconsideration"), which denied reconsideration of the February 7, 2020 Order Overruling Objection, issued on February 20, 2020.  *See* Doc. 1-2.

The effect of these orders was to overrule Appellants' objection to a proof of claim ("Proof of Claim") filed in the Bankruptcy Proceeding by the State of Connecticut, Second Injury Fund, Office of the Treasurer (the "Second Injury Fund" or the "SIF"), and to allow the SIF's claim as a general unsecured claim in the amount of $2,397,105.00.  Doc. 1-1 at 5.  In the Bankruptcy Proceeding, Appellants had objected to the Proof of Claim on the grounds that it was untimely

1

filed and that the SIF failed to establish the validity and amount of its claim. The SIF, as Appellee, opposes the appeal and contends that the orders below should be affirmed.

## I.     BACKGROUND OF THE BANKRUPTCY PROCEEDING

### A.  The May 13, 2015 Workers' Compensation Commission Order

On August 25, 2014, James A. Hawkins, III ("Hawkins") was killed during his employment at Debtor Hopkins, and "his death arose out of the course and scope of his employment." Doc. 5 ("Bankruptcy Proceeding Docket"), Doc. 76-1 at 3. At the time of the incident, Debtor Hopkins "did not have workers' compensation insurance coverage and was not deemed . . . self-insured pursuant to the Workers' Compensation Act, Chapter 568." Doc. 10-1 at A-92. Also, at the time of Hawkins's death, "he was married to Dawn Wilson and was supporting . . . two minor children, Anastasia Hawkins and Cecilia Hawkins. Bankruptcy Proceeding Docket, Doc. 76-1 at 3.

Accordingly, on May 13, 2015, the State of Connecticut Workers' Compensation Commission (the "Workers' Compensation Commission") ordered that Debtor Hopkins "pay weekly benefits separately in equal shares with annual cost of living adjustments to Dawn Wilson and Anastasia Hawkins . . . and Cecilia Hawkins." *Id.* at 5; *see also* Doc. 10-1 at A-92. In this order (the "May 13, 2015 Workers' Compensation Commission Order"), the Workers' Compensation Commission determined that, at the time of Hawkins's death, his "average weekly wage was $1,626.88 with a resulting compensation rate of $950.29." Bankruptcy Proceeding Docket, Doc. 76-1 at 3.

The May 13, 2015 Workers' Compensation Commission Order made several other pertinent findings. First, it noted that Debtor Hopkins must "pay annual cost of living adjustments pursuant to [Connecticut General Statutes] Section 31-307 beginning with each October 1st after [Hawkins's] death." *Id.* at 4. Second, it stated that, "[p]ursuant to [Connecticut General Statutes]

Section 31-306(5), "the two minor children, Anastasia Hawkins and Cecilia Hawkins, shall receive compensation until each child reaches the age of eighteen.  However, [they] shall continue to receive compensation up to the attainment of age the twenty-two if unmarried and . . . full-time student[s]."  *Id.*  Third, it found that "[w]hen either [of] the two minor children" cease to be eligible for benefits, "such child's share shall be divided among the remaining eligible dependents."  *Id.*  Fourth, "[i]n the event that Dawn Wilson's eligibility ceases, then her share shall be equally divided among the remaining eligible dependents as previously described."  *Id.*  Under Connecticut General Statutes § 31-306(3), "[i]f the surviving spouse is the sole presumptive dependent, compensation shall be paid until death or remarriage."

Pursuant to the May 13, 2015 Workers' Compensation Commission Order, Debtor Hopkins paid Hawkins's dependents "in accordance with [Connecticut General Statutes] § 31-306(4) subject to any annual cost of living adjustments pursuant to [Connecticut General Statutes] § 31-307 beginning with each October 1st after [Hawkins's] death."  Doc. 10-1 at A-92.  On June 13, 2018, a "subsequent Agreement Regarding Eligibility for Benefits was approved and ordered . . . modifying the distribution to eliminate payment to Anastasia Hawkins, who was emancipated, and altered the division of the death benefit payments to fifty percent to Cecilia Hawkins and fifty percent to Dawn Wilson."  Bankruptcy Proceeding Docket, Doc. 76 at 3.  The Court will refer collectively to Cecilia Hawkins and Dawn Wilson as the "Hawkins Dependents."

### B.  Initiation of the Bankruptcy Proceeding

On November 26, 2018 (the "Petition Date"), Debtor Hopkins filed a voluntary petition for bankruptcy under Chapter 7 of the U.S. Bankruptcy Code ("Chapter 7").  This filing commenced the Bankruptcy Proceeding, which was assigned to Bankruptcy Judge James J. Tancredi ("Judge

Tancredi"). On December 21, 2018, Debtor Hopkins filed a "Declaration Under Penalty of Perjury for Non-Individual Debtors." Bankruptcy Proceeding Docket, Doc. 13 at 1.

Included with this filing was a schedule of unsecured creditors entitled "Schedule E/F: Creditors Who Have Unsecured Claims" ("Schedule"). *Id.* at 12. Part two of this Schedule is a list of all creditors with nonpriority unsecured claims. *Id.* at 13. Among several other creditors, this list contains: "Anastasia Hawkins," "Cec[i]lia Hawkins," "CT Second Injury Fund," "Dawn Wilson," and "Dawn Wilson, Administrator." *Id.* at 13-14. The claim of each of these creditors is listed as "contingent," "unliquidated," and "disputed." *Id.* The amount of the claim to each of Anastasia Hawkins, Cecilia Hawkins, Dawn Wilson, and "Dawn Wilson, Administrator" is listed as $0.00. *Id.* The amount of the claim to the "CT Second Injury Fund" is listed as "Unknown." *Id.* at 14.

On December 26, 2018, the Bankruptcy Court set a deadline of February 4, 2019 (the "General Bar Date") for all creditors to file proofs of claim, except for "governmental units" within the meaning of 11 U.S.C. § 101(27). Doc. 1-1 at 1. The deadline for governmental units to file proofs of claim was set at the date "within 180 days of entry of the Order for Relief," which, if calculated from the [Petition Date], was May 25, 2019" (the "Governmental Unit Bar Date"). *Id.*

### C. The Second Injury Fund and its Proof of Claim

On December 11, 2018, Debtor Hopkins ceased making payments to Cecilia Hawkins. Doc. 10-1 at A-90, A-94. On April 23, 2019, Debtor Hopkins ceased making payments to Dawn Wilson. *Id.* When an employer is unable to pay the benefits ordered by the Workers' Compensation Commission, Connecticut law requires that such benefits be paid by the Second Injury Fund. Connecticut General Statutes § 3l-355(b) provides, in relevant part, that:

> When an award of compensation has been made under the provisions of this chapter against an employer who failed, neglected, refused or is unable to pay any type of benefit coming due as a consequence of such award or any adjustment in compensation required by this chapter . . . such compensation shall be paid from the Second Injury Fund. The administrative law judge, on a finding of failure or inability to pay compensation, shall give notice to the Treasurer of the award, directing the Treasurer to make payment from the [Second Injury Fund].

Since Connecticut General Statutes § 3l-355(b) is a provision of the Workers' Compensation Act, Chapter 568 ("Workers' Compensation Act"), the Court interprets the term "this chapter" to refer to the Workers' Compensation Act.   In the May 13, 2015 Workers' Compensation Commission Order, the Workers' Compensation Commission explicitly noted that Hawkins's claim against Debtor Hopkins "falls within the jurisdiction of the Connecticut Workers' Compensation Act."  Bankruptcy Proceeding Docket, Doc. 76-1 at 3.

Therefore, pursuant to Connecticut General Statutes § 3l-355(b), the SIF's obligation to make payments to the Hawkins Dependents is contingent upon two determinations by an administrative law judge ("ALJ").  Specifically, an ALJ must (1) find that Debtor Hopkins has failed or is unable to pay the Hawkins Dependents pursuant to the May 13, 2015 Workers' Compensation Commission Order; and (2) direct the Treasurer to make payment from the Second Injury Fund.  Until an ALJ makes these two determinations, the SIF is not responsible for payments to the Hawkins Dependents. The Court will refer to these two determinations as the "Entry of a Finding and Award Pursuant to Connecticut General Statutes § 31-355(b)."

Moreover, after the Entry of a Finding and Award Pursuant to Connecticut General Statutes § 31-355(b), which obligates the SIF to pay the Hawkins Dependents, the SIF becomes entitled to indemnification from Debtor Hopkins.  Connecticut General Statutes § 31-355(c) states:

> The employer . . . shall be liable to the state for any payments made out of the [Second Injury Fund] in accordance with this section or

5

> which the Treasurer has by award become obligated to make from the [Second Injury Fund], together with cost of attorneys' fees as fixed by the court.

However, as discussed *supra*, Debtor Hopkins's obligation to indemnify the SIF is contingent upon the SIF becoming obligated to pay the Hawkins Dependents the first instance. The SIF's obligation to pay Hawkins Dependents does not arise until the Entry of a Finding and Award Pursuant to Connecticut General Statutes § 31-355(b).

On March 19, 2019, in the Bankruptcy Proceeding, the SIF filed its Proof of Claim on Official Form 410. Doc. 10-1 at A-01. The Proof of Claim is signed by the "Assistant Treasurer" of the Second Injury Fund, who declares "under penalty of perjury that the [Proof of Claim] is true and correct." *Id.* at A-03. The introductory instructions on Official Form 410 direct filers to (1) "[a]ttach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements;" and (2) "explain in an attachment" if documents are unavailable. *Id.* at A-01. Official Form 410 further instructs filers to "[f]ill in all the information about the claim as of the date the case was filed." *Id.* Here, that date was the Petition Date of November 26, 2018.

In its Proof of Claim, the SIF states that the claim is for $2,397,105.00. *Id.* at A-02. The SIF also indicates that this amount does not "include interest or other charges." *Id.* If the amount *did* include interest or other charges, Official Form 410 instructs the filer to "[a]ttach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A)." *Id.* However, because the amount excludes interest or other charges, Form 410 does not appear to compel the SIF to attach such a statement. The SIF also represents that its claim is unsecured and that it is not entitled to priority under 11 U.S.C. § 507(a). *Id.* at A-02-03.

In response to the question on Official Form 410 asking for the "basis of the claim," the Second Injury Fund states that it is for "[f]uture workers' [compensation] benefits pursuant to [Connecticut General Statutes §§] 31-306 and 31-355." Connecticut General Statutes § 31-306 is a provision of the Workers' Compensation Act that deals with, *inter alia*, "[c]ompensation . . . paid to dependents on account of death resulting from an accident arising out of and in the course of employment." Conn. Gen. Stat. § 31-306(a). Regarding Connecticut General Statutes § 31-355, as discussed *supra*, the Second Injury Fund would be obligated to pay the Hawkins Dependents pursuant to the May 13, 2015 Workers' Compensation Commission Order after the Entry of a Finding and Award Pursuant to Connecticut General Statutes § 31-355(b). In this context, the Second Injury Fund's characterization of the claim as for *future* workers' compensation benefits is important. As of the Petition Date, there had not yet been an Entry of a Finding and Award Pursuant to Connecticut General Statutes § 31-355(b). Accordingly, the Proof of Claim asserted an unsecured claim against Debtor Hopkins for workers' compensation benefits the SIF *anticipated* paying to the Hawkins Dependents.

Adjacent to the question asking for the "basis" of the SIF's claim, Official Form 410 directs the filer to "[a]ttach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c)." Doc. 10-1 at A-02. In relevant part, Federal Rule of Bankruptcy Procedure 3001(c) states that "when a claim . . . is based on a writing, a copy of the writing shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim." The SIF attached to its Proof of Claim what appears to be a brief message with the subject line "Future Indemnity Value." *Id.* at A-04. In full, the message ("Future Indemnity Value Message") states:

> Per the attached Ultimate Value Calculator, the probable future Indemnity benefits to be paid on this claim are $2.4 million. This figure is NOT discounted to present value.
>
> This is based on a 32 year statistical life expectancy for this 51 year old dependent spouse (per the Office of the Actuary of the Social Security Administration), currently receiving Indemnity benefits of $54,200 annually, with an assumed annual escalation of 2.0%.

*Id.* at A-04.  The Proof of Claim does not state that the "dependent spouse" is Dawn Wilson, Hawkins's widow.  However, the SIF discusses how the claim relates to Dawn Wilson in its response to Debtor Hopkins's objection to its Proof of Claim, which is discussed *infra* in Section 1.E.  *See, e.g.*, Doc. 10-1 at A-29.  Therefore, the Court will refer to the spouse-claimant described in the Future Indemnity Value Message as Dawn Wilson.[1]

Also attached to the Proof of Claim is a "life expectancy table compiled from information published by the Office of the Actuary of the Social Security Administration."  *Id.* at A-05.  This table (the "Life Expectancy Table") indicates that a 51-year-old woman has an average life expectancy of 32.18 years.  *Id.* at A-06.  It appears that a service called AnnuityAdvantage created the Life Expectancy Table and indicated that it is "provided as a tool to assist" in "designing an

---

[1]    The SIF represents that "[a]lthough Cecilia Hawkins is entitled to share the award equally with Dawn Wilson while Cecilia Hawkins is under twenty-two and remains a full-time student, the total weekly benefit amount *would remain unchanged regardless of whether the award is shared or paid solely to Dawn Wilson*."  Doc. 12 at 5 n.3 (emphasis added).  Moreover, based on the present record, Cecilia Hawkins may soon be ineligible to share the award with Dawn Wilson.  *See* Doc. 10-1 at A-93-94 (stating that Cecilia Hawkins began attending [Quinebaug] Valley Community College on August 23, 2019 and "must provide proof [to the Workers' Compensation Commission] of her full-time attendance at school at the commencement of each semester through June 2022 as a condition of receiving her share of weekly benefits").  If Cecilia Hawkins becomes ineligible to receive a share of the benefits, Dawn Wilson will become the sole recipient.  The Court infers that these are the reasons why the Second Injury Fund's Proof of Claim focused solely on Dawn Wilson even though Cecilia Hawkins is also a Hawkins Dependent.  *See also* Doc. 8 at 6:21-8:14.

income plan that is appropriate for individual needs[,] and help retirees and near retirees in making informed decisions" with "appropriate assumptions." *Id.* at A-05.

Finally, the SIF includes with its Proof of Claim the results of an Ultimate Value Calculator from the Workers' Compensation Reinsurance Organization ("WCRA Ultimate Value Calculator") which purports to compute "the total of all future payments, given an escalation rate, a current annual payment, and a number of payment years." *Id.* at A-07. The WCRA apparently focuses on resinsurance for workers' compensation claims in the state of Minnesota. The SIF uses the WCRA Ultimate Value Calculator to multiply Dawn Wilson's alleged $54,200.00 annual benefit amount by her statistical 32-year lifespan and factors in a 2% escalation rate, which is meant to account for "projected annual cost of living increases at the rate of 2% per year." Doc. 12 at 5. This calculation results in the "probable" amount of the claim: $2,397,105.00. Doc. A-04. The SIF did not attach additional documentation supporting Dawn Wilson's asserted $54,200.00 annual benefit amount, the annual cost of living increases at the rate of 2% per year, or any specific facts about Dawn Wilson's health or marital status that would affect the amount of the claim.

### D.  The Hawkins Dependents' Motion for Relief from Stay

On April 22, 2019, the Hawkins Dependents filed a "Motion for Relief from Automatic Stay as to Workers' Compensation Benefits." Bankruptcy Proceeding Docket, Doc. 67. They amended this motion on April 26, 2019. *Id.*, Doc. 76. In sum, the Hawkins Dependents sought relief from the automatic stay "to exercise their rights and remedies in connection with Connecticut General Statutes § 31-306, specifically to recover death benefits owed to dependents by and through the Second Injury Fund pursuant to Connecticut General Statutes §§ 31-355 and 31-355a." *Id.* at ¶ 14. They further requested that they be "authorized to take any and all necessary actions

to proceed with pursuing benefits owed by [Debtor Hopkins] through the Second Injury Fund." *Id.* at ¶ B.  Their motion discussed the findings in the May 13, 2015 Workers' Compensation Commission Order directing Debtor Hopkins to pay them weekly benefits, *id.* at ¶ 10, and they attached that order to their motion.

On April 26, 2019, Debtor Hopkins responded to the Hawkins Dependents' motion.  It argued that that it "has insufficient information at this time to admit or deny" information related to the May 13, 2015 Workers' Compensation Commission Order.  Bankruptcy Proceeding Docket, Doc. 92 at 1.  Debtor Hopkins further objected to the Hawkins Dependents' request because, *inter alia*, it "directly conflicts with [the Proof of Claim] in that the Second Injury Fund has already made a claim for these benefits."  *Id.*  On May 28, 2019, Judge Tancredi held a hearing on the Hawkins Dependents' motion for relief from stay and granted it.  Judge Tancredi's order ("Order Granting Hawkins Dependents Relief from Automatic Stay"), *inter alia*, modified the automatic stay to:

> [P]ermit the [Hawkins Dependents] to commence and prosecute proceeding(s) to exercise their rights and remedies under applicable nonbankruptcy law against the Debtor and/or John J. O'Neil, Jr., as trustee for its Chapter 7 bankruptcy estate, in connection with Workers' Compensation benefits owed by and through a claim before the Second Injury Fund . . . .

Bankruptcy Proceeding Docket, Doc. 102 at 1-2.  The Order Granting Hawkins Dependents Relief from Automatic Stay further authorized the Hawkins Dependents to "take any and all necessary actions to proceed with prosecuting and collecting the benefits owed by [Debtor Hopkins] and/or its bankruptcy estate through a claim allowed and paid by the Second Injury Fund."  *Id.* at 2.

### E.  Objection to the Proof of Claim and the Second Injury Fund's Response

Debtor Hopkins filed its initial objection to the SIF's Proof of Claim on June 26, 2019 and its amended objection to the Proof of Claim (the "Bankruptcy Proceeding Objection") on July 2, 2019.  In sum, it objected on two grounds.   First, Debtor Hopkins argued that the Proof of Claim was untimely because it was filed after the General Bar Date of February 4, 2019.  *Id.* at A-23. Although the SIF filed the Proof of Claim before the Governmental Unit Bar Date of May 25, 2019, Debtor Hopkins asserted this later deadline was not applicable to the SIF since the SIF is not a governmental unit within the meaning of 11 U.S.C. § 101(27).  *Id.* at A-23-24

Second, Debtor Hopkins objected to the $2,397,105.00 amount asserted in the Proof of Claim.  As discussed *supra*, on the Petition Date, there had not yet been an Entry of a Finding and Award Pursuant to Connecticut General Statutes § 31-355(b).  Based on the assertion that the "amount owed by [Debtor Hopkins] to the Second Injury Fund was zero" on the Petition Date, Debtor Hopkins argued "that there is no proof of the validity of [the amount]."  *Id.*  Moreover, Debtor Hopkins claimed that "[w]hile the [SIF] uses compound interest to inflate its claim, it does not use [p]resent [v]alue discounting to bring its claim to the [Petition Date]."

The SIF responded to Debtor Hopkins's objection on August 2, 2019.  It submitted that Debtor Hopkins's objection should be overruled "because [Debtor Hopkins] lacks standing to object to the SIF's claim. But even if [Debtor Hopkins] is found to have standing, the [SIF] submits that the objection should be overruled because both of [Debtor Hopkins's] stated grounds for objection lack merit." *Id.* at A-29.  In sum, the SIF's standing argument was that (1) the Chapter 7 Trustee is generally the proper party to object to proofs of claim; and (2) Debtor Hopkins lacked standing because it has no pecuniary interest in the distribution of its assets among the creditors. *Id.* at A-30-31.  Regarding the merits of Debtor Hopkins's first ground for objection, that the Proof

of Claim was untimely, the SIF first argued that it is a governmental unit as defined in 11 U.S.C.

§ 101(27) and therefore its Proof of Claim, filed over two months before the Governmental Unit

Bar Date of May 25, 2019, was timely.  *Id.* at A-31-32.  Second, the SIF argued that, "since this is

a Chapter 7 case, the timeliness of a claim is not a proper basis for disallowance."  *Id.* at A-33.

Finally, the SIF addressed the merits of Debtor Hopkins's second ground for objection.  In

this context, the SIF stated:

> The [SIF] does not dispute that its right to payment against the
> Debtor was unmatured and contingent as of the [Petition Date].
> Under Connecticut law, the [SIF's] obligation to pay benefits in
> connection with the underlying workers['] compensation case, as
> well as the Debtor's obligation to indemnify the [SIF] for sums the
> [SIF] will be required to pay, are conditioned upon the entry of a
> "finding and award" pursuant to Conn. Gen Stat. §31-355(b). Upon
> information and belief, such finding and award had not been
> entered as of the [Petition Date] but there are proceedings currently
> pending before the Workers['] Compensation Commission to
> achieve that goal.

*Id.* at A-34 (footnote omitted).  In support of the claim that there are "proceedings currently

pending before the Workers' Compensation Commission to achieve" the Entry of a Finding and

Award Pursuant to Connecticut General Statutes § 31-355(b), the Second Injury Fund referenced

the Order Granting Hawkins Dependents Relief from Automatic Stay.  *Id.* at n.1.  The Second

Injury Fund further noted that, pursuant to that order, "[u]pon information and belief Dawn Wilson

and Cecilia Hawkins are currently seeking compensation from the [SIF] and a Pre-Formal hearing

before the Workers' Compensation Commissioner is scheduled for August 6, 2019."  *Id.*  Yet, even

though its right to payment against Debtor Hopkins was unmatured and contingent as of the

Petition Date, the SIF argued it had a "pre-petition claim" against Debtor Hopkins under the broad

definition of claim set forth at § 101(5)(A) of the Bankruptcy Code.  *Id.* at A-33-34.  The SIF did

12

not specifically address Debtor Hopkins's argument that declining to discount the amount of SIF's claim to present value improperly inflated this amount.

On August 12, 2019, Debtor Hopkins, Creditor Kirk D. Tavtigian ("Creditor Tavtigian"), and Creditor Donald Hopkins, the Appellants in the present appeal, filed a second amended objection to the Proof of Claim.  This second amended objection incorporated all statements and exhibits in Debtor Hopkins's amended objection filed on July 2, 2019.  *Id.* at A-37.  The addition of Creditor Donald Hopkins and Creditor Tavtigian as objecting Parties was apparently intended to counter the Second Injury Fund's argument that Debtor Hopkins lacked standing.  *See id.* at A-43 ("While the original Objector [Debtor Hopkins] disagrees with the position of the Second Injury Fund . . . on standing, there are now three Objectors to the SIF's proof of claim, two of whom are creditors who unquestionably have standing.").  Judge Tancredi scheduled a hearing on the objection to the Proof of Claim for September 19, 2019 and ordered Appellants to file a reply to the Second Injury Fund's response to the objection that delineates "any applicable legal authorities."  Bankruptcy Proceeding Docket, Dkt. 129.  Judge Tancredi issued a further order that "[i]n light of the nature of the dispute herein, the Chapter 7 Trustee is urged to attend and weigh in on the issues to be addressed at the hearing on September 19, 2019 . . . ."  *Id.*, Dkt. 134.

On September 17, 2019, Appellants filed their reply to the Second Injury Fund's response ("Appellants' Bankruptcy Proceeding Reply").  They reiterated their claim that the Second Injury Fund is not a governmental unit.  Doc. 10-1 at A-43-44.  They also expanded on their objection to the $2,397,105.00 amount asserted in the Proof of Claim.  Specifically, they claimed, *inter alia*, that (1) the SIF does not disclose "who they are using as a dependent spouse nor is there proof of her age or date of birth;" (2) there is no proof of the validity of the 2% annual escalation rate the SIF applies to arrive at the $2,397,105.00 amount; (3) the SIF assumes without providing

documentation that Debtor Hopkins is liable for a yearly payment of $54,200.00; and (4) the SIF "does not take into account on an actual or actuarial basis the fact that the annuity for the spouse terminates on her death or remarriage, and "it makes no allowance for her health, substance abuse habits, smoking or many other factors that could change this annuity stream." *Id.* at A-45.

The Bankruptcy Proceeding Reply also included two exhibits (the "Present Value Exhibits"). These exhibits purport to demonstrate that, even assuming a yearly payment of approximately $54,200.00 and a 32-year lifespan, the SIF's $2,397,105.00 amount would be reduced significantly if it were discounted to present value as of the Petition Date. Specifically, Exhibit C to the Bankruptcy Proceeding Reply uses a WCRA Present Value Calculator to show that the application of a discount rate of 10% (along with an escalation rate of 0%) would result in a discounted amount of $541,241.00. *Id.* at A-49. Exhibit D to the Bankruptcy Proceeding Reply uses a WCRA Present Value Calculator to show that the application of a discount rate of 8% (along with an escalation rate of 0%) would result in a discounted amount of $643,775.00. *Id.* at A-50. As discussed in Section 1.C *supra*, the SIF represented in its proof of claim that the $2,397,105.00 amount is "NOT discounted to present value." *Id.* at A-04. In disputing the amount of the claim, Appellants argued that "the fact of not discounting . . . to the [p]resent [v]alue is a glaring warning on the transmittal." *Id.* at A-45.

### F.  Judge Tancredi's Recusal and the November 12, 2019 Status Conference

At the hearing on Appellants' objection to the SIF's Proof of Claim, held on September 19, 2019, Judge Tancredi recused himself from this dispute before the Parties made arguments or offered evidence. However, he noted that "he is not going to send the entire case [to another judge]," only "this particular dispute." Doc. 7 at 13:14-18. This dispute was reassigned to Judge

Manning on September 25, 2019.  Bankruptcy Proceeding Docket, Doc. 143.  She scheduled a status conference (the "November 12, 2019 Status Conference") for November 12, 2019.

During the November 12, 2019 Status Conference, Judge Manning gave the impression that she was familiarizing herself with the issues in the dispute.  For example, she began the conference by stating:

> [T]he reason I don't know too much about this is that this is the matter that Judge Tancredi had to recuse himself and then – my understanding, if I'm correct, so please correct me, is we're dealing with an objection of claim; is that right?

Doc. 8 at 3:24-4:3.  She also noted that she "hasn't looked at anything on purpose" because she wanted the Parties to come to the conference and articulate their positions.  *Id.* at 5:6-8; *see also id.* at 12:24 ("I haven't looked at anything, as I said.").

Counsel for Debtor Hopkins and counsel for the SIF agreed that the Trustee has approximately $123,338.56 to distribute.  *Id.* at 10:9-24.  The Parties also discussed the issues underpinning Appellants' objection.  Regarding the SIF's argument that Debtor Hopkins lacked standing, counsel for the SIF stated that only the Trustee should be objecting, *id.* at 6:11-15, and the Parties discussed whether the Trustee had abandoned the claim, *id.* at 8:25-9:22.  Counsel for Debtor Hopkins stated that Debtor Hopkins objected because the claim is improper, inflated, and late-filed.  *Id.* at 11:2-10.  Moreover, Debtor Hopkins "wants people with properly filed claims to be paid."  *Id.*  at 11:13-14.  Creditor Tavtigian, one of the Appellants, noted that the SIF's claim will "wipe out" his claim, and Judge Manning agreed that the SIF's claim "is going to impact whether or not [Creditor Tavtigian] gets paid or how much [he] gets paid."  *Id.* at 19:20-25.  The Parties also discussed Appellants' argument that the SIF is not a governmental unit.  *See generally id.* at 12:24-17:23.

On the issue of Appellants' objection to the validity and amount of the SIF's claim, counsel for Dawn Wilson, Attorney Shafner, stated that a hearing on the Entry of a Finding and Award Pursuant to Connecticut General Statutes § 31-355(b) was to occur in two days: on November 14, 2019. *Id.* at 7:1-7; *see also id.* at 21:3-14 (counsel for the SIF explaining the purpose of "what's known as a finding and award under Connecticut General Statutes 31-355"). Moreover, Attorney Shafner stated that, at this hearing, the Workers' Compensation Commission would set the amount of the relevant claim:

> THE COURT: [] Counsel, I apologize but who's having the hearing on [November 14, 2019]?
>
> MR. SHAFNER: The Workers' Compensation Commission in Norwich.
>
> THE COURT: So don't they set the amount of the claim?
>
> MR. SHAFNER: Yes, they will, your Honor. And we hope the order will happen very quickly. They have 120 days after the hearing to issue the order, but the parties have stipulated to everything so we believe that within a few weeks after Thursday that we'll actually have an order . . .

*Id.* at 20:13-24. Attorney Shafner further represented that he would put the Entry of a Finding and Award Pursuant to Connecticut General Statutes § 31-355(b) on the Bankruptcy Proceeding Docket:

> THE COURT: I have no idea when the Worker's Compensation Commission will issue their finding and ruling, and the award I should say. Finding and award, is that what you said?
>
> [COUNSEL FOR THE SIF]: That's the terminology, finding and award.
>
> THE COURT: But I would ask -- and it may not be before this court does anything, but if it is would you please put it on the docket?
>
> MR. SHAFNER: Yes, your Honor.

THE COURT: I'd want to know that?

MR. SHAFNER: Would the Court want a copy of the order once
it's been issued?

THE COURT: Yes. On the docket.

MR. SHAFNER: Okay, okay.

THE COURT: Okay?

MR. SHAFNER: Yes.

THE COURT: I don't know if it means anything but it might, so
it's always better to have more information than less, right?

*Id.* at 23:7-24:1.  At the end of the conference, Judge Manning stated that "hopefully we'll tell you

in the next 30 or so days . . . what I think is going to happen here in this court." *Id.* at 24:10-12.

There was no discussion of the allegations in Appellants' Bankruptcy Proceeding Reply that the

SIF failed to provide sufficient evidence of specific facts underpinning its Proof of Claim.  There

was also no discussion of the Present Value Exhibits or Appellants' objection to the fact that the

SIF's $2,397,105.00 claim was not discounted to present value.

### G.  The November 14, 2019 Entry of a Finding and Award

On November 14, 2019, the Workers' Compensation Commission held a hearing before

Compensation Commissioner for the State of Connecticut Peter Mlynarczyk ("Commissioner

Mlynarczyk").  Doc. 10-1 at A-85.  On that same day, November 14, 2019, Commissioner

Mlynarczyk entered a finding and award pursuant to Connecticut General Statutes § 31-355(b)

(the "November 14, 2019 Entry of a Finding and Award").  Doc. 10-1 at A-87-94.

The November 14, 2019 Entry of a Finding and Award apparently begins with a

"Stipulation of Facts and Proposed Order Pursuant to C.G.S. Section 31-355," which is executed

by counsel for the Hawkins Dependents and the SIF.  *Id.* at A-88-91.  This stipulation of facts

discusses, *inter alia*, Hawkins's death during his employment at Debtor Hopkins; that Dawn Wilson remains unmarried; that Cecilia Hawkins is a full-time college student; Hawkins's average weekly wage of $1,626.88 with a resulting compensation rate of $950.29; the May 13, 2015 Workers' Compensation Commission Order; and the dates on which Debtor Hopkins stopped making payments to Dawn Wilson (April 23, 2019) and Cecilia Hawkins (December 11, 2018). *Id.* It contains citations to an "Affidavit by Dawn Wilson" and Hawkins's "Wage Records." *Id.* at A-88-90. The stipulation ends by stating that the Hawkins Dependents request "that the Second Injury Fund be ordered to make payments as [Debtor Hopkins] has failed to make said payments; and has filed for bankruptcy." *Id.* at A-90.

Commissioner Mlynarczyk's November 14, 2019 Entry of a Finding and Award recites many of the facts in the stipulation. For example, it notes that, per the May 13, 2015 Workers' Compensation Order, Hawkins's average weekly wage was $1,626.88 at the time of his death, with a resulting compensation rate of $950.29. *Id.* at A-92. It further notes that, as of November 14, 2019, Dawn Wilson remains unmarried. *Id.* at A-93. Moreover, it states that Cecilia Hawkins is attending "[Quinebaug] Valley Community College . . . as a full time student for the Fall 2019 semester and continues to be eligible to receive compensation up to the attainment of the age of twenty-two if unmarried and a full-time student." *Id.*

As discussed *supra* in Section I.C, pursuant to Connecticut General Statutes § 31-355(b), the Second Injury Fund's obligation to make payments to the Hawkins Dependents and therefore seek indemnity from Debtor Hopkins is contingent upon two determinations: (1) that Debtor Hopkins has failed or is unable to pay the Hawkins Dependents pursuant to the May 13, 2015 Workers' Compensation Commission Order; and (2) that the Treasurer must make payment from the Second Injury Fund. In the November 14, 2019 Entry of a Finding and Award, Commissioner

Mlynarczyk first found that Debtor Hopkins "has failed, neglected, refused, and is unable to pay the compensation awarded to the [Hawkins Dependents] as ordered on May 13, 2015." *Id.* Second, he made the following order:

> 1. The Treasure[r] for the State of Connecticut is directed to commence making payments from the Second Injury Fund for weekly benefits separately in equal amounts with annual cost of living adjustments to Dawn Wilson retroactive to April 23, 2019 and Cecilia Hawkins retroactive to December 11, 2018.
>
> 2. It is further ordered that Cecilia Hawkins must provide proof of her full time attendance at school at the commencement of each semester through June 2022 as a condition of receiving her share of weekly benefits.
>
> 3. It is further ordered that Dawn Wilson shall notify the State of Connecticut, Second Injury Fund, should she remarry.
>
> 4. It is further ordered that any party may request a hearing with the Workers' Compensation Commission, who shall continue to have jurisdiction over this case.

*Id.* at A-94.

As discussed *supra* in Section I.F, Judge Manning requested that the Entry of a Finding and Award Pursuant to Connecticut General Statutes § 31-355(b) be placed on the Bankruptcy Proceeding Docket once it had been issued. However, there is no indication that any Party placed the November 14, 2019 Entry of a Finding and Award on the Bankruptcy Proceeding Docket before Judge Manning issued the February 7, 2020 Order Overruling Objection discussed in the next section. Moreover, contrary to representations during the November 12, 2019 Status Conference, the November 14, 2019 Entry of a Finding and Award does not "set the amount" of the SIF's claim. Doc. 8 at 20:17-18. Instead, the only dollar amount discussed in the November 14, 2019 Entry of a Finding and Award is a reiteration of the finding in the May 13, 2015 Workers' Compensation Commission Order about Hawkins's average weekly wage of $1,626.88 and

resulting compensation rate of $950.29.  Doc. 10-1 at A-92.  Therefore, as discussed further *infra*, the November 14, 2019 Entry of a Finding and Award does not directly support the SIF's "probable" future claim for $2,397,105.00.  *Id.* at A-04.

### H.  The February 7, 2020 Order Overruling Objection

On February 7, 2020, Judge Manning overruled Appellants' objection and allowed the SIF's claim "as a general unsecured claim pursuant to 11 U.S.C. § 502(b) in the amount of $2,397,105.00 conditioned upon the entry of a finding and award pursuant to Conn. Gen. Stat. 31-355(b)."  Doc. 1-1 at 5.  On the threshold issue of whether Debtor Hopkins has standing to object to the SIF's claim, Judge Manning held that, because Appellants' objection is overruled and the SIF's claim is allowed on the merits, "the issue of standing does not need to be addressed."  *Id.* at 1 n.1.  Judge Manning characterizes Appellants' objection as asserting that "(i) the Second Injury Fund is not a governmental unit within the meaning of 11 U.S.C. § 101(27) and was therefore not entitled to file a claim after [the General Bar Date]; and (ii) the amount of the claim was zero on the [Petition Date]."  *Id.* at 2.  Judge Manning disagreed with both assertions. *Id.*

Most of the analysis in the February 7, 2020 Order Overruling Objection is focused on the first of these assertions.  Judge Manning assesses the plain language of 11 U.S.C. § 101(27), the legislative history of the statute, a leading bankruptcy treatise, and case law to determine that the SIF is a governmental unit under 11 U.S.C. § 101(27).  *Id.* at 2-4.  Regarding the second assertion, Judge Manning points to the broad definition of "claim" under the Bankruptcy Code and finds that a claim "can exist . . . before a right to payment exists under state law."  *Id.* at 4 (citation omitted). Thus, she held that "the Second Injury Fund had a right to payment even if its claim had not been reduced to a judgment or was unliquidated, contingent, or unmatured on the [Petition Date]."  *Id.* at 5.

Similar to the November 12, 2019 Status Conference, Judge Manning did not address the allegations in Appellants' Bankruptcy Proceeding Reply that the SIF included insufficient information with its Proof of Claim. As discussed *supra* in Section I.E., these allegations included, *inter alia*, that the SIF has not proved the validity of the 2% annual escalation rate and the assumed yearly payment of $54,200.00. These allegations also included the claim that the SIF does not make allowance for Dawn Wilson's health or other factors that could change the annuity stream. Moreover, Judge Manning did not discuss Appellants' Present Value Exhibits or Appellants' objection to the fact that the SIF's $2,397,105.00 claim is not discounted to present value.

## I. Appellants' Motion for Reconsideration and the February 20, 2020 Order Denying Reconsideration

On February 12, 2020, Appellants filed a motion asking that the Bankruptcy Court reconsider and modify the February 7, 2020 Order Overruling Objection. Doc. 10-1 at A-67-68. They filed a "corrected" version of this motion on the same day. *Id.* at A-83-84. In this corrected motion ("Appellants' Motion for Reconsideration"), they note that, at the November 12, 2019 Status Conference, "the Second Injury Fund stated on the record that it would provide proof of the claim amount by filing with the court the results" of the then-upcoming November 14, 2019 Entry of a Finding and Award. *Id.* at A-83. However, "[t]hey did not." *Id*. Here, the Court assumes that Appellants refer to Dawn Wilson's counsel's statement during the November 12, 2019 Status Conference that he would put the Entry of a Finding and Award Pursuant to Connecticut General Statutes § 31-355(b) on the Bankruptcy Proceeding. Doc. 8 at 23:7-16.

Second, Appellants attached a copy of the November 14, 2019 Entry of a Finding and Award to their motion for reconsideration and argued that "[t]here is no proof, confirmation, or endorsement of the claim for $2,397,105.00." Doc. 10-1 at A-83. Therefore, Appellants claimed

that the SIF, "despite its representation to [the Bankruptcy Court], has provided no support at all for its claim of $2,397,105.00." *Id.* at A-83-84. Third, Appellants argued that the Bankruptcy Court did not address the other bases of their objection to the amount in the SIF's Proof of Claim. *Id.* at A-84. Specifically, the "the Court did not address the issue of the actuarial valuation and present value discounting of the claim amount." *Id.* Finally, highlighting the Bankruptcy Court's language that the amount of the claim is allowed "conditioned upon the entry of a finding and award pursuant to Conn. Gen. Stat § 31-355(b)," Appellants noted that this condition "has not been reached and will never be reached." *Id.*

Judge Manning overruled Appellants' Motion for Reconsideration on February 20, 2020. In the February 20, 2020 Order Denying Reconsideration, she ruled as follows:

> The Motion for Reconsideration of the Memorandum and Order Overruling Debtor's Objection to Proof of Claim No. 6, ECF No. 178, which the Court deems to be a Motion for Relief from, Judgment/Order pursuant to Federal Rule of Civil Procedure 60 and Federal Rule of Bankruptcy Procedure 9024, is **DENIED.** None of the grounds for relief set forth in Federal Rule of Civil Procedure 60 and Federal Rule of Bankruptcy Procedure 9024 exist to relieve the, Debtor from the Memorandum and Order allowing the general unsecured claim of the Second Injury Fund in the amount of $2,397,105.00, conditioned upon the entry of a finding and award pursuant to Conn. Gen. Stat. § 3l-355(b). The argument that the Second Injury Fund has failed to provide a proof of the claim by filing the results of the Workers Compensation hearing is unpersuasive because the Memorandum and Order Overruling Debtor's Objection to Proof of Claim No. 6 "conditioned [allowance, of the general unsecured claim] upon the entry of a finding and award pursuant to Conn. Gen. Stat. § 3 l-355(b)." The argument that the Second Injury Fund "has provided no support at all for its claim of $2,397,105.00" is also unpersuasive because the Second Injury Fund attached to Proof of Claim No. 6 a future indemnity valuation of the claim.

## II.     THE PRESENT APPEAL

On February 26, 2020, Appellants appealed the February 7, 2020 Order Overruling Objection and the February 20, 2020 Order Denying Reconsideration.  They appeal on two main grounds.  First, they argue that the Bankruptcy Court erred by ruling that (1) the SIF was a governmental unit within the meaning of 11 U.S.C. § 101(27); and (2) the SIF's Proof of Claim, which was filed after the General Bar Date but before the Governmental Unit Bar Date, was timely filed.  *See* Doc. 10 at 8-11.  In this context, Appellants explain that:

> If the SIF is not a governmental unit as defined in 11 U.S.C. § 101(27), then its proof of claim was filed late and therefore is subordinated to the other creditors of the bankruptcy estate.
>
> If the SIF is a governmental unit[,] its proof of claim was timely filed.
>
> In light of the magnitude of the SIF's claim compared to the minimal funds available in the debtor's bankruptcy estate for payment of claims, if the SIF's claim is deemed timely filed it will usurp the claims of all other creditors.

*Id.* at 4.  Accordingly, Appellants request that the Court reverse the Bankruptcy Court's decision on this issue and either (1) determine that the SIF is not a governmental unit for the purposes of 11 U.S.C. § 101(27); or (2) remand the case to the Bankruptcy Court with directions to hold an evidentiary hearing on the issue of whether the SIF is a governmental unit.  *Id.* at 13.  The SIF counters that the Bankruptcy Court correctly concluded that the SIF is a governmental unit pursuant to 11 U.S.C. 101(27) and urge that the Bankruptcy Court's ruling on this issue should be affirmed.  Doc. 12 at 9-15, 25.  This Court addresses whether the SIF is a governmental unit within the meaning of 11 U.S.C. § 101(27) in Section IV *infra*.

Appellants' second ground for appeal is that the Bankruptcy Court erred by allowing the SIF's claim as a general unsecured claim in the amount of $2,397,105.00 because the SIF did not

present evidence proving the validity and amount of its claim.  Appellants' arguments on this point focus mainly on the alleged lack of information supporting certain facts in the SIF's Proof of Claim.  *See* Doc. 10 at 13.  In this context, Appellants also allege that the Bankruptcy Court failed to (1) adjudicate "each basis of the objection that Appellants asserted;" and (2) "failed to discount to present value the SIF's claim to payments as of the [Petition Date]."  *Id.* at 2.  Therefore, Appellants ask that the Court reverse the Bankruptcy Court's decision on this issue and either (1) determine that the SIF did not establish the validity and amount of its claim; or (2) remand the case to the Bankruptcy Court with directions to hold an evidentiary hearing on the issue of the validity and amount of the SIF's claims.  *Id.* at 13.  By contrast, the SIF argues that Appellants' objection is based on "unsupported suggestions" and claims that it was therefore "not required to prove" the facts underpinning this objection.  Doc. 12 at 18.  The SIF urges this Court to affirm the Bankruptcy Court's February 7, 2020 Order Overruling Objection such that the SIF's $2,397,105.00 claim is allowed.  *Id.* at 12, 25.  The Court addresses the validity and amount of the SIF's claim in Section V *infra.*

### III.   JURISDICTION AND STANDARD OF REVIEW

This Court has jurisdiction to rule on the present appeal pursuant to 28 U.S.C. § 158(a)(1).  Title 28 section 158(a)(1) confers jurisdiction on the "district courts of the United States . . . to hear appeals (1) from final judgments, orders, and decrees" of the Bankruptcy Court. 28 U.S.C. § 158(a). *See, e.g.*, *In re Fugazy Express, Inc.*, 982 F.2d 769, 774 (2d Cir.1992) (recognizing that a district court rules on a bankruptcy matter as an appellate court pursuant to § 158(a)); *In re White*, 183 B.R. 356, 358 (Bankr. D. Conn.1995) ("A district court has jurisdiction to hear appeals of final bankruptcy orders pursuant to 28 U.S.C. § 158(a).").

In reviewing an appeal from a bankruptcy court, a district court applies a clearly erroneous standard to findings of fact and a *de novo* standard to conclusions of law. *See, e.g.*, *In re Chateaugay Corp.*, 89 F.3d 942, 946 (2d Cir. 1996)*; In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988 (2d Cir. 1990), *cert. denied*, 502 U.S. 808 (1991); *In re Manville Forest Products Corp.*, 896 F.2d 1384, 1388 (2d Cir. 1990); *In re FYM Clinical Lab., Inc.*, 1997 WL 666238 at *3 (S.D.N.Y. 1997). Mixed questions of fact and law are also reviewed *de novo*. *See In re Vebeliunas,* 332 F.3d 85, 90 (2d Cir. 2003). Evidentiary rulings are reviewed for abuse of discretion. *See, e.g., In re McGinnis,* 296 F.3d 730, 732 (8th Cir. 2002); *First Bank Investors' Trust v. Tarkio College,* 129 F.3d 471, 476 (8th Cir. 1997).

## IV.   THE SIF IS A GOVERNMENTAL UNIT, AND ITS PROOF OF CLAIM WAS TIMELY FILED

On appeal, Appellants argue that (1) the SIF is not a governmental unit pursuant to 11 U.S.C. § 101(27); and (2) therefore the SIF's Proof of Claim, which was filed after the General Bar Date but before the Governmental Unit Bar Date, was untimely filed. The SIF counters that it is a governmental unit pursuant to 11 U.S.C. § 101(27) and therefore its Proof of Claim was timely filed. For the following reasons, the Court determines that the SIF is a governmental unit within the meaning of 11 U.S.C. § 101(27).

### A. The SIF is a Governmental Unit within the Meaning of 11 U.S.C. § 101(27)

The phrase "governmental unit" is derived from the introductory definitions with which the Bankruptcy Code begins. Section 101(27) of the Bankruptcy Code provides:

> The term "governmental unit" means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States . . . a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

25

This statutory definition is broadly drawn.  Its relevance to the present appeal lies in the provision that a "department, agency, or instrumentality" of "a State" is a "governmental unit" for purposes of the Bankruptcy Code.  The meaning of that phrase is discussed in the Bankruptcy Code's legislative history:

> "Department, agency, or instrumentality" does not include an entity that owes its existence to state action, such as the granting of a charter of license but that has no other connection with a state or local government or the federal government. The relationship must be an active one in which the department, agency, or instrumentality is actually carrying out some governmental function.

S. Rep. No. 95-989, at 24 (1979).  A leading bankruptcy text draws the distinction that to be characterized as a "governmental unit," a state department or agency must "actually be carrying out governmental rather than private objectives."  2 Collier on Bankruptcy ¶ 101.27 (16th ed. 2022).  The February 7, 2020 Order Overruling Objection cites and quotes these authorities, and concludes that the SIF was a "governmental unit" of the state of Connecticut under 11 U.S.C. § 101(27).  That conclusion is correct.

The SIF is a statutorily created entity operated and administered by the Office of the Treasurer of the State of Connecticut.  Conn. Gen. Stat. § 31-354; *see also* Office of Treasurer Shawn W. Wooden, Second Injury Fund Overview, https://portal.ct.gov/OTT/Second-Injury-Fund/Overview (last visited April 24, 2022) ("The Second Injury Fund . . . is a state operated workers' compensation insurance fund . . . .").  As the February 7, 2020 Order Overruling Objection accurately observed, "[p]ublic insurance, which is the role of the Second Injury Fund, is traditionally a function of state government."  Doc. 1-1 at 3 (citing *Second Injury Fund v. National Union Fire Ins. Co. of Pittsburgh PA,* No. 3:10cv86 (SRU), 2010 WL 2698271, at *5 (D. Conn. July 8, 2010)).

The present appeal furnishes an example of the SIF fulfilling the governmental function of providing public insurance in the form of workers' compensation benefits to the dependents of an employee killed while working for an uninsured employer.  Under the state statutory scheme, the SIF is funded by assessments "each employer, other than the state" is required to pay to support this public purpose.  Conn. Gen. Stat. § 31-354(a).   Moreover, the state Treasurer serves as "the custodian of the [SIF] and all disbursements from the [SIF] shall be made by the Treasurer and the Treasurer's deputies."  Conn. Gen. Stat. § 31-354(a).  Specifically:

> The Treasurer may, in his discretion, appoint not more than four assistant administrators as necessary to assist him in carrying out his duties as custodian of the Second Injury Fund under section 31-354. Such assistant administrators shall be in the unclassified service and shall serve at the pleasure of the Treasurer. Such assistant administrators shall be sworn to the faithful discharge of their duties and shall perform such functions relating to the administration of the Second Injury Fund . . . as the Treasurer may direct.

Conn. Gen. Stat. § 31-354a(a).[2]  This is an example of an entity carrying out governmental rather than private objectives.

---

[2]     At the November 12, 2019 Status Conference, Creditor Tavtigian stated that "the board of [the SIF] has no state employees.  They're all outside people who are not employed by the State of Connecticut."  Doc. 8 at 19:4-6.  He suggested that, while "not a dispositive factor," this fact may weigh against the finding that the SIF is a governmental unit.  *Id.* at 19:6-7.  However, the fact that, pursuant to Connecticut General Statutes Section 31-349e, the Fund may also have an advisory board does not weigh against its classification as a governmental unit.  *National Union Fire Ins. Co.*, 2010 WL 2698271, at *4 n.3.  First, under the statute, board members are chosen by the Treasurer and members of the General Assembly, who serve *ex officio.*  "The authority of each member derives directly from being state elected or appointed officials." *Id.* Second, the advisory board does not have binding power over the administration of the SIF.  Instead, it merely advises the Treasurer "on matters concerning administration, operation, claim handling and finances of the fund."  Conn. Gen. Stat. § 31-349e.  Connecticut General Statutes Section 31-349d, which establishes that the Treasurer may solicit proposals for the managing of Second Injury Fund claims, also does not weigh against classification of the SIF as a governmental unit. "The power provided to the Treasurer is exercised in [his] discretion, which indicates [he] represents the state's interest in exercising that power."  *National Union Fire Ins. Co.*, 2010 WL 2698271, at *4 n.3

In *Second Injury Fund v. National Union Fire Ins. Co. of Pittsburgh PA*, No. 3:10-cv-86, 2010 WL 2698271 (D. Conn.  July 8, 2010), the SIF paid workers' compensation benefits arising out of an airplane accident and alleged that it was exposed to pay future indemnity benefits.  *Id.* at *1.  Therefore, it sued the defendant insurance company in a Connecticut state court alleging a right of recoupment.  *Id.*  The defendant, which was incorporated under the laws of the Commonwealth of Pennsylvania and had a principal place of business in New York, New York, removed the case to the District of Connecticut on the basis on diversity of citizenship.  *Id.*  The SIF moved to remand to state court.  *Id.*  Chief Judge Underhill noted that "[a] state is not considered a citizen for purposes of diversity jurisdiction" and found that "[d]iversity jurisdiction does not exist in this case if the Second Injury Fund, acting by and though the Treasurer of the state of Connecticut, is an arm or alter ego of the state of Connecticut."  *Id.* at *2.

Chief Judge Underhill then reviewed the purpose and function of the SIF and noted:

> The Second Injury Fund was established primarily to encourage the employment of persons with an existing disability and, at the same time, to provide adequate workers' compensation benefits for them. The function of public insurance is traditionally a function of state government, and this factor . . . points toward the Second Injury Fund being an arm or alter ego of the state . . . .

*Id.* at *5.  Chief Judge Underhill also found that, *inter alia*, the SIF's ability to assess private employers as a condition of doing business in Connecticut shows "a close connection between the [SIF] and the state's power to tax and regulate business."  *Id.* at *4 (citing Conn. Gen. Stat. § 31-354(a)).  Moreover, he found that "the fact that the state has pledged its 'faith and credit' for the safekeeping of the funds the SIF receives shows a direct connection between the [SIF] and the public fisc."  *Id.* (observing that, pursuant to Conn. Gen. Stat. 31-354(a), the sums that the SIF receives "shall be accounted for separately and apart from other state money," but that "the faith

and credit of the state of Connecticut is pledged for their safekeeping"). Based, *inter alia*, on these findings, he held that the SIF "does not act autonomously from, but rather is an arm of, the state of Connecticut," and consequently granted the SIF's motion to remand. *Id.* at *3. While *National Union Fire Ins. Co.* and the Bankruptcy Proceeding address different issues and are not squarely on point, Judge Manning expressed the view that *National Union Fire Ins. Co.* "supports the finding that the Second Injury fund is a governmental unit" in the case at bar.[3] Doc. 1-1 at 3. That is a reasonable reading of this opinion.

---

[3]     Appellants emphasize Chief Judge Underhill's finding that "[a] state suing on behalf of a circumscribed group of its citizens . . . may sufficiently dispose with its sovereign capacity to be subject to the district courts' diversity jurisdiction." *Nat'l Union Fire Ins. Co.*, 2010 WL 2698271, at *3 n.2 (internal quotation marks and citation omitted). They argue that, in the Bankruptcy Proceeding, the SIF is acting on behalf of "not even a group, but only one citizen," namely, Dawn Wilson. Doc. 17 at 2. However, while Chief Judge Underhill's findings about the purpose and function of the SIF are applicable beyond the diversity context, findings specific to the controlling citizen status for subject matter jurisdiction are not. For example, Appellants cite the finding in *Connecticut v. Levi Strauss & Co.*, 471 F. Supp. 363, 371 (D. Conn. 1979) that "[w]hen Connecticut claims refunds to be distributed to identifiable purchasers, the citizen status of the purchasers rather than the sovereign status of their benefactor controls for diversity purposes." In that case, the state of Connecticut sought to remand an antitrust damage suit that it brought in state court against a defendant that had removed on both federal question and diversity grounds. *Levi Strauss & Co.*, 471 F. Supp. at 365. The court did not assess whether the state of Connecticut was a governmental unit. Instead, the court addressed whether, for the purposes of diversity jurisdiction, the citizenship of the beneficiaries of the state's claim should control. *Id.* at 370-71. The court in *Levi Strauss & Co.* answered this question in the affirmative by noting that the Supreme Court's original jurisdiction has been disrupted "whenever it appeared that [a state's] real claim was being brought only on behalf of particular citizens." *Id.* at 371; *see also Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976) (finding that "[a] state has standing to sue [by invoking the Supreme Court's original jurisdiction] only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens" and stating that this rule prevents inundation of the Supreme Court's docket and protects the constitutional distinction between suits brought by citizens and those brought by states); *State of N. Dakota v. State of Minnesota*, 263 U.S. 365, 371-72 (1923) (finding that the original jurisdiction of the Supreme Court is limited generally to disputes which, between states entirely independent, might be properly the subject of diplomatic adjustment and involve a state interest "independent of and behind the titles of its citizens"). The present appeal does not involve (1) citizenship in the context of diversity jurisdiction; or (2) the sovereign interests of a state entity for standing and/or jurisdictional purposes. Accordingly, *Levi Strauss & Co.* is inapposite to the question of whether the SIF is a governmental unit for the purposes of 11 U.S.C. § 101(27).

Given the plain wording of 11 U.S.C. § 101(27) and these additional authorities, Judge Manning correctly held that the SIF was a governmental unit for purposes of interpreting and implementing the Bankruptcy Code, including applying the bar dates in the Bankruptcy Proceeding. Appellants' contrary contention is unpersuasive for the reasons stated in the following section.

### B. Appellants' Claim is Unpersuasive

Appellants claim that the SIF is not a governmental unit within the meaning of 11 U.S.C. § 101(27) and therefore its Proof of Claim was untimely filed. However, Appellants' briefs cite no authorities that contradict the opposing position established by the weight of the authority cited in Section IV.A *supra*. On appeal to this Court, Appellants' briefs rely principally on *In re Pulley*, 295 B.R. 28 (Bankr. D.N.J.), *aff'd*, 303 B.R. 81 (D.N.J. 2003). Appellants argue that "[d]espite the fact that *In re Pulley* is directly on point, and despite the fact that [A]ppellants in their initial [b]rief relied on and discussed *In re Pulley* at some length, the SIF's brief ignores and fails to address the merits of *In re Pulley*'s decision on the governmental unit issue." Doc. 17 at 1. *Pulley* is a decision of the Bankruptcy Court for the District of New Jersey, which was affirmed on appeal by the District Court for the District of New Jersey. Neither the bankruptcy court decision nor the appellate decision is binding on this Court. These decisions are also not persuasive in this case: contrary to Appellants' assertion, the decisions in *Pulley* are not "directly on point" with the issues in the present appeal.

In *Pulley*, a discharged Chapter 7 debtor reopened her case to initiate an adversary proceeding to determine whether motor vehicle surcharges levied against her by the New Jersey Division of Motor Vehicles ("DMV") constituted dischargable debt. *Pulley*, 303 B.R. at 82-83. Under chapter 7 of the Bankruptcy Code, a debtor is often entitled to receive a discharge of his or

her debts.  11 U.S.C. § 727.  However, there are exceptions to discharge, which are contained in Bankruptcy Code Section 523.  11 U.S.C. § 523(a).  Pursuant to 11 U.S.C. 523(a)(7) (the "Discharge Exception"), a debt is nondischargable if it is (1) a fine, penalty, or forfeiture, (2) payable to and for the benefit of a governmental unit, and (3) not compensation for actual pecuniary loss.  *Pulley* considered two entities characterized as "joint insurance underwriting association[s]."  *Id.* at 83.  These entities "had the authority to issue [their] own policies" and were created by New Jersey state statutes.  *Id.*  The Bankruptcy Court for the District of New Jersey and the District Court for the District of New Jersey addressed the question of whether the DMV surcharges, which were deposited into a fund dedicated to servicing the financial obligations of one of these organizations, were payable "for the benefit of a governmental unit" under the Discharge Exception.  *Pulley*, 303 B.R. at 88 (emphasis added).

The first entity the case considered was the New Jersey Automobile Full Insurance Underwriting Association (the "JUA"), and the second was the Market Transition Facility (the "MTF").  *Id.* at 83.  In 1982, a New Jersey state statute meant to "reform the insurance system" in New Jersey created the JUA.  *Id.*  The JUA was an "unincorporated nonprofit organization designed to be an insurer of last resort organized to provide affordable automobile liability coverage."  *Id.* (internal quotation marks and citations omitted).  It issued policies in its own name. *Id.*  It was "comprised of all insurers that would sell automobile liability insurance in the State, and participation in the JUA was mandatory."  *Id.*  According to the Bankruptcy Court for the District of New Jersey, the "JUA's mandatory membership tends to cast [the] JUA as a private or otherwise nongovernmental enterprise."  *Id.* (citing *Pulley*, 295 B.R. at 41).  The JUA was subject to state taxation.  *Id.*  Moreover, pursuant to the relevant New Jersey statute, the JUA's operation

was funded, in part, by a system of DMV surcharges.  *Id.*  Yet, by 1990, the JUA had $3 billion in losses and was "hopelessly insolvent."  *Id.* (internal quotation marks and citations omitted).

To replace the JUA, in 1990, New Jersey passed additional legislation which created the MTF as well as the Guaranty Fund, a funding mechanism in which DMV surcharges were deposited.  *Id.*  Yet, within the first four years of the MTF's existence, it had added $1.3 billion in losses to the JUA's "already dismal financial condition."  *Id.*  Therefore, the Property Liability Insurance Guaranty Association, a private, nonprofit, unincorporated legal entity that is comprised of all insurers licensed to conduct business in New Jersey, was compelled to make loans to the Guaranty Fund, initially for JUA debt.  *Id.* at 83-84.

New Jersey state legislation passed in 1994 provided immediate bulk MTF deficit funding by empowering the New Jersey Economic Development Authority to issue Market Transition Facility bonds ("MTF Bonds").  *Id.* at 84.  The 1994 legislation also created the Market Transition Facility Revenue Fund (the "MTF Revenue Fund"), a nonlapsing fund designed to pay the principal and interest and premium, if any, on the MTF Bonds or notes.  *Id.* at 86. The DMV surcharge was redirected to service MTF Bonds until the bond debt was discharged.  *Id.*  "Funds in excess of the amount required to be used to service the MTF bonds [were] remitted to the State's General Fund."  *Id.* at 84 (citation omitted).  DMV surcharge funds collected between October 1, 1991 and August 31, 1996 were to be deposited into the Guaranty Fund.  *Id.* at 86.  Funds deposited into the Guaranty Fund and interest earned thereon would be utilized exclusively for satisfying the financial obligations of the JUA.  *Id.*  Commencing on September 1, 1996, DMV surcharge funds were to be deposited into the MTF Revenue Fund, which was designed to service MTF Bonds.  *Id.*

The District Court for the District of New Jersey (the "Appellate Court") characterized the collection and distribution of the DMV surcharges at issue in *Pulley* as follows:

> The surcharges at issue here are first collected by the DMV, not the Department of the Treasury. The money is then deposited into the MTF Revenue Fund, and is dedicated to servicing the financial obligations of the MTF. The funds are used to repay investors, whether private or public, before any surplus reaches the Department of the Treasury. The fact that funds pass through a government is irrelevant here; the State is collecting the debt for service of the MTF debt and redistribution to private creditors.

*Id.* at 89.

First, based on this "money trail," *id.* at 86, the Appellate Court determined that the State of New Jersey was not the beneficiary of the DMV surcharges such that they came within the Discharge Exception, *id.* at 89. Therefore, it affirmed the Bankruptcy Court for the District of New Jersey's finding that the DMV surcharges were dischargeable debt. *Id.* at 90. Second, the Appellate Court found that the legislative history of 11 U.S.C. § 101(27) "supports [this] decision." *Id.* at 89. Specifically, as discussed *supra* in Section IV.A, for an entity to be considered a governmental unit under 11 U.S.C. § 101(27), it must carry out "some governmental function." S. Rep. No. 95-989, at 24 (1979). In *Pulley*, the Appellate Court determined that the "main function of the JUA and MTF is as underwriters [and] issuers of insurance policies, functions that are non-governmental in nature." *Id.* at 89; *but see, e.g.*, *In re Kish*, 221 B.R. 118, 131 (Bankr. D.N.J. 1998) (under the Eleventh Amendment test set forth in *Christy v. Pennsylvania Tpk. Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995), the JUA was held to be an arm of the State and the MTF was not); *In re Kent*, 190 B.R. 196, 204 (Bankr. D.N.J. 1995) (holding, *inter alia*, that the JUA and the MTF were "instrumentalities of the state"). The Court expresses neither approval nor disapproval of the courts' rulings in *Pulley*. In any event, these rulings furnish no guidance in determining whether, on the facts and circumstances of the present appeal, the SIF should be regarded as a governmental unit for the purpose of applying the bar dates in the Bankruptcy Proceeding.

Regarding the first finding in *Pulley*, the question of whether the collection of funds is "for the benefit of a governmental unit" under the Discharge Exception is not determinative of whether the SIF is a governmental unit under 11 U.S.C. § 101(27).  Instead, as discussed *supra* in Section IV.A, the relevant inquiry under 11 U.S.C. § 101(27) is whether the SIF is carrying out a governmental function rather than a private one.  This inquiry is entirely separate from whether the funds the SIF collects benefit it directly.   Indeed, to qualify as a governmental unit under 11 U.S.C. § 101(27), the SIF need not benefit directly from the funds it collects because the funds are used to serve injured workers and Connecticut employers, which is a legitimate governmental function that will "inure to the general benefit of the state's citizens."  *In re Kish*, 238 B.R. 271, 286 (Bankr. D.N.J. 1999).  For example, the Bankruptcy Court for the District of New Jersey has stated that:

> [It] does not doubt that by collecting surcharges for payment to third parties the state is performing a legitimate governmental function, but that is not the issue under the [Discharge Exception]. The issue is whether the collections are "for the benefit of a governmental unit." It is apparent from the definition of "governmental unit" in Code section 101(27) that the citizens of New Jersey as a whole are not a governmental unit.

*Id.*; *see also Re Hurtado*, No. 10-48668 (DHS), 2014 WL 5431321, at *4 (Bankr. D.N.J. Oct. 21, 2014) (finding that penalty distributed into a fund for the purpose of benefiting citizens of New Jersey with valid workers' compensation claims was nonetheless dischargable because it was "not payable for the benefit of a governmental unit as required by . . . section 523(a)(7)").  In their initial appellate brief, Appellants cite several cases in support of their argument that "funds that are collected by the government and are to be used solely to pay designated beneficiaries are not funds that benefit the government."  Doc. 10 at 10.  However, that argument is misplaced because

whether the SIF benefits from the funds it collects for the purposes of the Discharge Exception is not at issue in the present appeal.

The second finding in *Pulley*, that the JUA and the MTF carry out functions that are non-governmental in nature, is also inapposite because the function of these entities is different from the function of the SIF. As discussed *supra*, the Appellate Court in *Pulley* found that the JUA and MTF function as underwriters and issue automobile insurance policies. *See also Pulley*, 295 B.R. at 55 (Bankruptcy Court for the District of New Jersey finding that "[JUA] was an insurance company, as was its transitory successor, MTF, though MTF was also functioning as an insolvency facilitator;" and that the MTF functioned as "both a nonprecedent setting market-opening joint underwriting association and as a liquidation medium" but "[n]either function is governmental in nature"). By contrast, the SIF does not underwrite or sell workers' compensation insurance to private employers within Connecticut. Instead, "its function is to provide a safety net for injured employees (and their dependents) in the event their employers fail to comply with the legal obligation to obtain private workers['] compensation insurance." Doc. 12 at 12-13. In line with Chief Judge Underhill's finding discussed *supra* in Section IV.A, the Court finds that this "function of public insurance is traditionally a function of state government." *National Union Fire Ins. Co.*, 2010 WL 2698271 at *5. Therefore, the Court concludes that, in the context of the present appeal, and unlike the entities in *Pulley*, the SIF is a "governmental unit" for the purposes of 11 U.S.C. § 101(27).

### C. Conclusion

For the foregoing reasons, Judge Manning's ruling that the SIF is a governmental unit within the meaning of 11 U.S.C. § 101(27) is AFFIRMED. The Court next turns to Appellants' claim that the Bankruptcy Court erred by allowing the SIF's claim as a general unsecured claim.

**V.      APPELLANTS ARE ENTITLED TO ADDITIONAL INFORMATION ON THE VALIDITY AND AMOUNT OF THE SIF'S CLAIM**

A "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). As a preliminary matter, during the Bankruptcy Proceeding, Appellants argued that Debtor Hopkins owed nothing to the SIF on the Petition Date and therefore the SIF's claim was invalid. Judge Manning rejected that contention in the February 7, 2020 Order Overruling Objection and held that the SIF "had a right to payment even if its claim had not been reduced to a judgment or was unliquidated, contingent, or unmatured on the [Petition Date]." Doc. 1-1 at 5. On appeal, Appellants do not argue that Judge Manning's ruling on this particular issue was in error. Therefore, they seem to accept in principle the SIF's right to assert a claim for payment that, as of the Petition Date, was conditioned upon the Entry of a Finding and Award Pursuant to Connecticut General Statutes § 31-355(b). Instead, they argue that the Bankruptcy Court erred by allowing the SIF's Proof of Claim in the amount of $2,397,105.00 even though the SIF "did not present evidence proving the validity and amount of its claim." *See* Doc. 10 at 11. The Court will focus its analysis on this issue.

**A.  The Burden-Shifting Framework**

The purpose of filing a proof of claim is to share in any distribution of the bankruptcy estate. *See* Fed. R. Bankr. P. 3002(a); *In re DeGeorge Fin. Corp.*, No. 99-32300-02 (ASD), 2002 WL 31096716, at *4 (D. Conn. July 15, 2002). "The holder of a claim against the debtor may participate in the distribution of the debtor's estate only if the claim is 'allowed,'" and "the claim is deemed allowed unless an objection is raised." *DeGeorge Fin. Corp.*, 2002 WL 31096716, at *4 (citing 11 U.S.C. § 502(a)). "A proof of claim executed and filed in accordance with [the

Federal Rules of Bankruptcy Procedure] shall constitute *prima facie* evidence of the validity and amount of the claim."  Fed. R. Bankr. P. 3001(f).

Specifically, Federal Rule of Bankruptcy Procedure 3001 and Official Form 410 "govern the form, content and required attachments for proofs of claim."  *In re Live Primary, LLC,* 626 B.R. 171, 188 (Bankr. S.D.N.Y. 2021).  For example, as discussed *supra* in Section 1.C, Federal Rule of Bankruptcy Procedure 3001(c) states that "when a claim . . . is based on a writing, a copy of the writing shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim."  Similarly, Official Form 410, on which the SIF filed its Proof of Claim, directs creditors to (1) "[a]ttach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements;" and (2) "explain in an attachment" if documents are unavailable.  Doc. 10-1 at A-01.

Yet, "[t]he actual documentary evidence needed to establish and verify the proof of claim cannot be reduced to a bright-line test; rather, it is decided on a case-by-case basis."  *Live Primary*, 626 B.R. at 189.  If a proof of claim is found to lack *prima facie* validity due to a failure to attach sufficient documentation, courts disagree whether and under what circumstances this can result in disallowance of the underlying claim.  Indeed, 11 U.S.C. § 502(b) identifies nine categories of claims which will be disallowed but does not identify "insufficient documentation" as a basis to disallow a claim.  Accordingly, some courts in this Circuit have declined to disallow claims based on creditors attaching insufficient documentation to the proof of claim.  *See, e.g.*, *In re Irons* 343 B.R. 32, 41 (Bankr. N.D.N.Y. 2006) (allowing claims where "proofs of claim [did] not constitute *prima facie* evidence of the amount of the claims" but, "in the absence of any evidence to contradict

the amounts of the claims, there is no basis to disallow the claims pursuant to Code § 502(b)");

*accord Robinson v. Olin Fed. Credit Union*, 48 B.R. 732, 736 (D. Conn. 1984) ("Section 502(b)

instructs the Bankruptcy Court to allow the claim unless it finds one of several specifically listed

reasons for disallowance.  The clear implication of section 502(b) is that, absent a finding of one

of these enumerated reasons, the claim shall be considered to be allowed.").

By contrast, other courts in this Circuit have deemed this approach too rigid and have

disallowed claims, under certain circumstances, due to lack of supporting documentation attached

to the proof of claim.  For example, the Bankruptcy Court for the District of Connecticut found:

> It is well established that the only substantive grounds for
> disallowance of a claim are expressly set forth in the Bankruptcy
> Code.  Accordingly, lack of the documentation required by Rule
> 3001(c) (which is, *a priori,* a mere procedural rule) is not
> a *substantive* ground for disallowing a claim.  However . . . under
> some circumstances lack of such documentation followed by a
> creditor's failure to appear or otherwise respond to an objection . . .
> made on the grounds of insufficient annexed documentation may
> result in a disallowance of the claim on procedural (i.e., default)
> grounds.

*In re Porter*, 374 B.R. 471, 480 (Bankr. D. Conn. 2007); *see also In re Minbatiwalla*, 424 B.R.

104, 119 (Bankr. S.D.N.Y. 2010) ("[I]n certain circumstances claims can be disallowed for failure

to support the claim with sufficient evidence, even if this is not a specifically enumerated reason

for disallowance under 11 U.S.C. § 502(b), because absent adequate documentation, the proof of

claim is not sufficient for the objector to concede the validity of a claim"); *Cordier v. Plains*

*Commerce Bank (In re Cordier)*, Bankr. No. 08–20298(ASD), Adv. Pro. No. 08–2037, 2009 WL

890604, *3 (Bankr. D. Conn. 2009) (distinguishing the "enumerated exceptions to allowance of a

proof of claim" from a challenge to the validity or amount of the proof of claim that would result

in disallowance of the claim on procedural grounds).

However, if a proof of claim *does* constitute *prima facie* evidence of the validity and the amount of the claim, then "the party objecting to such a claim has the initial burden of going forward with evidence to refute the claim even though the creditor retains the ultimate burden of persuasion with regard to the validity of the claim." *Live Primary*, 626 B.R. at 188 (collecting cases). Here, "the objector" must "produce evidence and show facts tending to defeat the claim by probative force equal to that of the allegations of the proofs of claim themselves." *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991) (internal citation omitted).

### B. Appellants are Entitled to Additional Information Regarding the Validity and Amount of the SIF's Claim Whether or Not the Proof of Claim Constitutes *Prima Facie* Evidence of the Validity and Amount of the Claim

On appeal, Appellants argue that the SIF's Proof of Claim "failed to provide facts necessary to support its claim, and therefore its Proof of Claim was not entitled to the presumption of [*prima facie*] validity." Doc. 17 at 2. Appellants allege that the SIF's Proof of Claim failed to show: (1) "the amount of the claim and how the amount had been determined;" (2) that the SIF's liability or the amount of its liability to the Hawkins Dependents had been adjudicated; (3) the basis for the purported 2% annual escalation of the future payments to Dawn Wilson; (4) Dawn Wilson's age or date of birth; (5) whether Dawn Wilson is remarried such that her benefits would terminate; (6) facts supporting the Dawn Wilson's "health, substance abuse habits, smoking or many other factors that could change the annuity stream." Doc. 10 at 7; *see also* Doc. 17 at 3-5. Collectively, the Court will refer to these points as "Appellants' Insufficient Information Allegations." Furthermore, Appellants claim that they have been unable to determine "whether there have been any agreements or proposals by the SIF and the claimant to settle the claim set forth in the SIF's [Proof of Claim], which could significantly reduce the amount of the SIF's claim." Doc. 10 at 12.

The SIF counters that, because its Proof of Claim was filed in accordance with the Federal Rules of Bankruptcy Procedure, it is *prima facie* evidence of the validity and the amount of their claim.   Doc. 12 at 15-16, 18.   Accordingly, it claims that the evidentiary burden shifted to Appellants to refute at least one of the allegations that is essential to the claim's legal sufficiency. *Id.*  Moreover, if Appellants had met this burden, the ultimate burden of persuasion would rest on the SIF.   *Id*.   Yet, the SIF claims that Appellants have not met their burden to refute the validity and amount of the Proof of Claim.   Specifically:

> It was the Appellants' burden to prove that the claimant's age or life expectancy was incorrect, that the claimant had remarried or was about to remarry, that the projected cost of living increase was improper, and that the amount [the] SIF would have to pay to [Dawn Wilson] would be lower than projected. The Appellants' unsupported suggestions that Dawn Wilson was not 51 years of age on the [Petition Date], that she is a smoker, is unhealthy, and is a substance abuser are simply insufficient to shift the burden of persuasion to [the] SIF.

*Id.* at 18.  Therefore, the SIF claims that it was not required to present further evidence to support its claim before the Bankruptcy Court could enter an order allowing it.  *Id.*

However, contrary to the Parties' arguments, the present appeal does not turn on whether the Proof of Claim constituted *prima facie* evidence of the validity and amount of the SIF's claim. Therefore, the Court does not reach or decide this issue in the present Ruling.  Instead, regardless of whether the Proof of Claim is *prima facie* evidence, the Court determines that Appellants are entitled to further inquiry into the validity and amount of the SIF's claim if their objection is (1) consistent with Debtor Hopkins's sworn schedules; and (2) sufficiently specific in its request for appropriate information.  Applying this standard, the Court determines that Appellants are entitled to additional inquiry into Appellants' Insufficient Information Allegations as described in Section V.B.ii *infra*.  This conclusion is reinforced by the fact that the November 14, 2019 Entry of a

Finding and Award, on which the February 7, 2020 Order Overruling Objection was conditioned, does not directly support the $2,397,105.00 amount or the key inputs the SIF uses to calculate this amount.

The Court's analysis in this section will proceed as follows. First, the Court will discuss the legal underpinnings of its finding that Appellants are entitled to further inquiry into the validity and amount of the SIF's claims, if certain conditions are met, whether or not the Proof of Claim amounted to *prima facie* evidence of the SIF's claim. Second, the Court will apply this legal standard to Appellants' Insufficient Documentation Allegations and identify the extent to which these allegations meet this standard and entitle Appellants to further inquiry. Third, the Court will find that this conclusion is strengthened by the fact that the November 14, 2019 Entry of a Finding and Award does not directly support the $2,397,105.00 amount of the SIF's claim.

    i.   <u>Legal Discussion</u>

In *In re Heath*, 331 B.R. 424, 436-37 (2005), the Bankruptcy Appellate Panel of the Ninth Circuit (the "BAP") summarized the principle the Court applies in this case:

> [W]e agree with courts in the majority [of reported decisions] that creditors have an obligation to respond to formal or informal requests for information. That request could even come in the form of a claims objection, if it is sufficiently specific about the information required. This obligation to respond applies regardless [of] whether [c]reditors have met their obligation to provide [an account] summary under Rule 3001(c).

*See also In re Cluff*, 313 B.R. 323, 335-36 (Bankr. D. Utah 2004), *aff'd sub nom. Cluff v. eCast Settlement*, No. 2:04-CV-978 TS, 2006 WL 2820005 (D. Utah Sept. 29, 2006); (finding that "using a summary also requires the creditor to make the underlying documents available for examination at a reasonable place and time, and such creditors should not underestimate the Court's willingness

to compel them to do so," and interpreting Fed. R. Bankr. P. 3001 consistent with Fed. R. Evid. 1006); *In re Shank*, 315 B.R. 799, 816 (Bankr. N.D. Ga. 2004) ("A debtor or other objecting party . . . is clearly entitled to receive documentation and other information about a creditor's claim if there is a question about it. The Court expects creditors who file proofs of claim . . . to respond promptly and fully to an appropriate request for information . . . ."). The BAP further noted that, if the request for information comes in the form of an objection, the objection "should not be inconsistent with sworn schedules that concede all or some portion of the debt." *Heath*, 331 B.R. at 436 n.6.

In *Heath*, Chapter 7 debtors objected to credit card issuers' proofs of claim as lacking necessary documentary support, and the BAP affirmed the bankruptcy court's decision to overrule debtors' objections and allow creditors' claims. There, unlike in the present Ruling, the BAP reached the issue of whether proofs of claim by certain creditors met the standard for *prima facie* validity under Rule 3001. In the credit card context, proofs of claim can meet this standard by attaching "some sort of [account] summary," though "[t]here is no uniform standard for what must be contained in such a summary." *Id.* at 432. The BAP found that some of the account summaries included with the relevant proofs of claim "probably fail all of the various tests for *prima facie* validity." *Id.* at 433. However, the BAP held that debtors' objection on this basis – which does not appear in 11 U.S.C. § 502(b) – was an insufficient reason to disallow the associated claims. *See id.* at 426 ("Section 502(b) sets forth the exclusive grounds for disallowance of claims . . .").

Importantly, however, the BAP emphasized that creditors have an obligation to respond to requests for further information – even those stated in the form of an objection – *whether or not* the proof of claim constitutes *prima facie* evidence of the claim's validity and amount. Moreover, the BAP determined that a request for information in the form of an objection must identify

42

"appropriate documentation of any claims that [debtors] reasonably believed they might not owe, or might owe in a different amount" rather than relying "solely on the alleged lack of *prima facie* validity of the proofs of claim." *Id.* at 438.  In *Heath*, the BAP found that debtors relied solely on the alleged lack of *prima facie* validity by stating simply in their objections that "no supporting writing" was attached to creditors' proof of claim.  *Id.* at 427.  Their objections also did not specify the particular charges, if any, that they disputed.  The BAP noted:

> We would be faced with a very different case if, for example, [d]ebtors' objections stated that they had written to a [c]reditor explaining that they questioned *specific* charges, or that during the slide into bankruptcy they had not reviewed or retained their monthly statements, and therefore they wanted the past twelve months' credit card statements to verify the Creditor's calculation of principal, interest, and other charges.

*Id.* at 437 (emphasis added).  The BAP also found that the debtors in *Heath* did not schedule any of their credit card debts as disputed, and that the amounts asserted in creditors' proofs of claim were only in a "slightly higher amount" than the amounts listed in debtors' schedules.  *Id.* at 427-28.

Creditors' obligation to provide information to debtors reflects the proposition that, "[i]f the debtor thinks that every one of the challenged claims is overstated, that every claimant has included illegal or unauthorized charges, or that for any reason [debtor] has no liability to any of them, [debtor] may investigate fully [debtor's] theories and raise every viable claim or defense that [debtor] has."  *Shank*, 315 B.R. at 815; *see also In re Gorman*, 495 B.R. 823, 838 (Bankr. E.D. Tenn. 2013) (same).  Although the present appeal does not involve unauthorized charges on a credit card statement, this principle is equally applicable to Appellants' efforts to dispute the validity and amount of the SIF's claim.

In line with this proposition, bankruptcy courts in this Circuit have also stated that, whether or not a proof of claim meets the standard for *prima facie* validity, a creditor is obligated to respond to requests for documents.  *Porter*, 374 B.R. at 482-83 (in the credit card context, disallowing proofs of claim based on (1) lack of supporting documents; and (2) evidence that creditors both ignored debtor's request for information and failed to respond to debtor's insufficient documentation objection); *see also In re Minbatiwalla*, 424 B.R. 104, 115 (Bankr. S.D.N.Y. 2010) (noting that the procedure in *Porter* whereby creditors must respond to objectors has been "applied in considering objections to claims arising from credit card receivables"); *id.* at 117 (finding, in the mortgage lien context, that "[u]pon request of the debtor, the creditor has an obligation to provide additional documentation underlying [the summary and affidavit the creditor is required to attach to the proof of claim] . . . within two weeks after dispatch or communication of such a request").

However, creditors' obligation is circumscribed by the need to protect creditors against unreasonable requests for information. In this vein, the BAP in *Heath* observed that creditors should not be required to:

> Provide volumes of documentation attached to every proof of claim or in response to objections based solely on non-compliance with Rule 3001(c) . . . [which] would unduly burden the parties and would inundate the Court with documents. It would also invite abusive objections and more litigation and would serve no purpose because if there is no substantive objection to the claim, the creditor should not be required to provide any further documentation of it.

*Heath*, 331 B.R. at 436 (internal quotation marks and citations omitted).  Accordingly, the BAP concluded that requests in the form of objections should not be inconsistent with sworn schedules that concede at least some portion of the debt; and should be detailed in their information request.

Although the above cases are not binding on the Court, the Court finds their reasoning persuasive. Therefore, the Court arrives at the principle stated *supra*: regardless of whether the Proof of Claim constitutes *prima facie* evidence of the validity and amount of the SIF's claim, Appellants are entitled to further inquiry into the specifics of the SIF's claim if their objection is (1) consistent with Debtor Hopkins's sworn schedules; and (2) sufficiently specific in its request for appropriate information. In the next section, the Court will apply this principle to Appellants' Insufficient Document Allegations.

      ii.  <u>Application to Appellants' Insufficient Documentation Allegations</u>

As an initial matter, Appellants' objection to the SIF's Proof of Claim is consistent with Debtor Hopkins's sworn Schedule. As discussed *supra* in Section I.B, Debtor Hopkins's Schedule lists "Anastasia Hawkins," "Cec[i]lia Hawkins," "CT Second Injury Fund," "Dawn Wilson," and "Dawn Wilson, Administrator." Bankruptcy Proceeding Docket, Doc. 13 at 13-14. The claim of each creditor is listed as "contingent," "unliquidated," and "disputed." *Id.* The amount of the claim to each of Anastasia Hawkins, Cecilia Hawkins, Dawn Wilson, and "Dawn Wilson, Administrator" is listed as $0.00. *Id.* The amount of the claim to the "CT Second Injury Fund" is listed as "Unknown." *Id.* at 14. Appellants' objection to the validity of the SIF's Proof of Claim is consistent with Debtor Hopkins's characterization of the SIF's claim (and the claims of the Hawkins Dependents) as disputed. Similarly, Appellants' objection to the $2,397,105.00 amount of SIF's Proof of Claim is consistent with listing the amount of the SIF's claim as "unknown."

These representations distinguish Appellants from the debtors in *Heath*. Unlike the debtors in *Heath*, Debtor Hopkins listed its debt to the SIF as "disputed." Also unlike *Heath*, where the amounts asserted in creditors' proofs of claim were in a slightly higher amount than the amounts listed in debtors' schedules, there is a stark mismatch between the representations in Debtor

Hopkins's Schedule and the $2,397,105.00 amount asserted in the SIF's Proof of Claim.  The SIF does not argue that Debtor Hopkins's Schedule or Appellants' objection were filed in bad faith. Therefore, the Court determines that Appellants' objection to the SIF's Proof of Claim is consistent with Debtor Hopkins's sworn Schedule.  The Court now turns to assessing whether each of Appellants' Insufficient Information Allegations, which the Court construes as requests for information per *Heath*, are sufficiently specific.  In this assessment, the Court will weigh Appellants' need to evaluate and challenge the Proof of Claim against the need to protect the SIF from unduly burdensome requests for information.

First, Appellants allege that the Proof of Claim does not provide information as to the "amount of the claim and how the amount had been determined."  Doc. 10 at 7.  This allegation implicates the statement in the Future Indemnity Value Message attached to the Proof of Claim, which states that Dawn Wilson is "currently receiving [i]ndemnity benefits of $54,200 annually." Doc. 10-1 at A-04.  Indeed, in Appellants' Bankruptcy Proceeding Reply, they object to the amount of the Proof of Claim because the SIF "uses an *assumed* yearly payment of $54,200."  *Id.* at A-45 (emphasis added).  There is no further documentation attached to the Proof of Claim containing the origin of this $54,200.00 figure, and this figure does not match Debtor Hopkins's assertions in its Schedule about the "disputed" claims to the SIF and the Hawkins Dependents.

If this figure is somehow linked to the May 13, 2015 Workers' Compensation Commission Order, pursuant to which Debtor Hopkins paid the Hawkins Dependents until it filed for bankruptcy, the Court notes that the $54,200.00 figure does not appear anywhere in this order. Instead, the May 13, 2015 Workers' Compensation Commission Order finds that Debtor Hopkins should pay "weekly benefits with annual cost of living adjustments" and states that Hawkins's

compensation rate was $950.29.  Bankruptcy Proceeding Docket, Doc. 76-1 at 3, 5.  Multiplying $950.29 by 52 weeks results in $49,415.08, which also does not match the $54,200.00 figure.

The Court acknowledges that, assuming the validity of the other inputs into the SIF's calculation (including a 32-year lifespan and a 2% escalation rate), the difference between these numbers may not significantly reduce the amount of the $2,397,105.00 claim.  However, in the interest of giving Appellants, including Debtor Hopkins, the opportunity to "investigate fully" and "raise every viable claim or defense," Appellants are entitled to more information on how the SIF arrived at the $54,200.00 figure if this request is sufficiently specific.  *Shank*, 315 B.R. at 815.  This request pinpoints a specific input into the calculation of the SIF's $2,397,105.00 claim.  Therefore, the Court determines that it is sufficiently specific so long as it is not unduly burdensome to the SIF in the discretion of the Bankruptcy Court.  Accordingly, Appellants are entitled to a reasonable production of additional information on the SIF's calculation of the $54,200.00 figure and the origins of any inputs into this calculation.

Second, Appellants allege on appeal that the Proof of Claim does not show that the SIF's liability or the amount of its liability to the Hawkins Dependents had been adjudicated.  Doc. 10 at 7.  The November 14, 2019 Entry of a Finding and Award directing the Treasurer to make payment from the Second Injury Fund occurred after (1) the Petition Date of November 26, 2018 (the relevant date for purposes of the Proof of Claim) and (2) March 19, 2019 (the day the SIF filed the Proof of Claim).  Therefore, when the SIF filed the Proof of Claim, it would have been impossible for it to attach the November 14, 2019 Entry of a Finding and Award.

If Appellants seek access to the November 14, 2019 Entry of a Finding and Award at this stage of the action, the Court declines to order that the SIF provide it to them.  Appellants apparently are already aware of the November 14, 2019 Entry of a Finding and Award because it

was attached it to Appellants' Motion for Reconsideration.  Directing the SIF to provide Appellants with information they already have would not afford them a better opportunity to investigate the SIF's claim.  However, if (1) the SIF was a party to any adjudication on its liability or the amount of its liability to the Hawkins Dependents *other than* the November 14, 2019 Entry of a Finding and Award; (2) Debtor Hopkins was not a party to that adjudication; and (3) the results of that adjudication have not been filed on the Bankruptcy Proceeding Docket, the Court finds that the SIF should be required to provide this information to Appellants so long as this request is not unduly burdensome in the discretion of the Bankruptcy Court.

Third, Appellants allege that the Proof of Claim does not provide information as to the "purported 2% annual escalation of the future payments" to Dawn Wilson.  Doc. 10 at 7.  The attachments to the Proof of Claim state that the $2,397,105.00 amount is based, *inter alia*, on an "assumed annual escalation of 2.0%."  Doc. 10-1 at A-04.  Although the May 13, 2015 Workers' Compensation Commission Order states that "annual cost of living adjustments" should be factored into the weekly benefits Debtor Hopkins is to pay the Hawkins Dependents, it does not list 2% as the escalation rate.  Bankruptcy Proceeding Docket, Doc. 76-1 at 5.  Yet, the impact of applying this rate is significant.  Over the assumed 32-year lifespan of Dawn Wilson, this assumed 2% escalation rate increases the $54,200.00 alleged annual benefits to $100,139.31.  Doc. 10-1 at A-07-08.  To give Appellants the opportunity to "investigate fully" and "raise every viable claim or defense," the Court determines that Appellants are entitled to more information on how this 2% escalation rate was selected if this request is sufficiently specific.  *Shank*, 315 B.R. at 815.  Similar to the findings *supra*, because this request pinpoints a specific input into the calculation of the SIF's $2,397,105.00 claim, the Court determines that it is sufficiently specific so long as it is not unduly burdensome to SIF in the discretion of the Bankruptcy Court.  Accordingly, Appellants are

entitled to a reasonable production of additional information on the SIF's selection of the 2%
escalation rate.

Fourth, Appellants allege that the SIF failed to include crucial pieces of information about
Dawn Wilson: her age or date of birth; whether she is remarried such that her benefits would
terminate; and facts supporting her "health, substance abuse habits, smoking or many other factors
that could change the annuity stream." Doc. 10 at 7; *see also* Doc. 17 at 3-4.  Appellants argue:

> The valuation of [the] SIF's proof of claim was based on the life
> expectancy table for an average 51 year old woman. But underlying
> [the] SIF's proof of claim is one particular individual, Dawn Wilson.
> She is the beneficiary of the claim. The SIF's proof of claim tells us
> nothing about that particular individual. The SIF's proof of claim
> says nothing about Dawn Wilson's health and other factors that
> significantly affect her life expectancy.
>
> Is she a smoker? Does she suffer from any serious illnesses or
> conditions, such as for example, heart disease? Does she suffer from
> obesity? Where does she live? Is she still a widow?
>
> The SIF in its proof of claim provided no particularized information
> about Dawn Wilson other than her (purported) age. It provided no
> information regarding factors that could significantly affect her life
> expectancy, upon which the SIF's proof of claim depended.
>
> Is she remarried?
>
> The SIF's proof of claim told us nothing about whether Dawn Wilson
> is remarried. If she is remarried, her benefits from the Second Injury
> Fund terminate. Is she married? We don't know, because [the] SIF
> did not address this very significant piece of information in its proof
> of claim. The SIF in its proof of claim did not provide an affidavit
> from Dawn Wilson or any other verification to support its proof of
> claim and the calculation of the amount of the proof of claim[.]

Doc. 17 at 3-4 (footnotes omitted).  As discussed in Section I.C *supra*, the Future Indemnity Value
Message attached to the SIF's Proof of Claim notes that the $2,397,105.00 amount "is based on a
32 year statistical life expectancy for this 51 year old dependent spouse (per the Office of the
Actuary of the Social Security Administration)." Doc. 10-1 at A-04.  It also attaches a Life

Expectancy Table suggesting that a 51-year-old woman has an average lifespan of 32.18 years. *Id.* at A-05-06. However, even though the SIF represents that "varying states of health and lifestyle" factor into actuarial tables like the Life Expectancy Table, this data is not specific to Dawn Wilson. Doc. 12 at 18. By obtaining more information specific to "Dawn Wilson's health and other factors that significantly affect her life expectancy," Appellants could more fully investigate the assumption that she will live 32 years. Doc. 17 at 3. Indeed, assuming the validity of the other inputs into the SIF's calculation (including the $54,200.00 annual indemnity benefits and the 2% escalation rate), the assumed 32-year lifespan contributes significantly to the magnitude of the amount of the SIF's $2,397,105.00 claim.

However, the Court must also evaluate whether Appellants' request is sufficiently detailed such that it would not unduly burden the SIF. Regarding Dawn Wilson's (1) age or date or birth and (2) whether she is remarried such that her benefits would terminate,[4] the Court determines that these requests are sufficiently specific so long as they do not unduly burden the SIF in the discretion of the Bankruptcy Court. Therefore, Appellants are entitled to a reasonable production of additional information on these points.

However, the Court determines that, as presently stated, the Appellants' initial, general requests for facts supporting Dawn Wilson's "health" and "many other factors that could change the annuity stream" are not sufficiently specific. Doc. 10 at 7. That said, more targeted questions would probably be less burdensome for the SIF and less likely to generate a significant volume of

---

[4]     The November 14, 2019 Entry of a Finding and Award states that, as of November 14, 2019, "Dawn Wilson remains unmarried." Doc. 10-1 at A-93. Moreover, it is "ordered that Dawn Wilson shall notify the State of Connecticut, Second Injury Fund, should she remarry." *Id.* at A-94. The Court construes Appellants' request for information about Dawn Wilson's present marital status as an inquiry into her marital status at the present time (i.e., the time of this Ruling). Since it is possible that her marital status has changed since November 14, 2019, the Court determines that Appellants are entitled to this information in the interest of fully investigating the SIF's claim.

information.  *See, e.g.*, Doc. 17 at 3-4 (asking, *inter alia*, whether Dawn Wilson is a smoker or whether she suffers from "any serious illnesses or conditions, such as[,] for example, heart disease").  Analogous inquiries may include whether Dawn Wilson is currently undergoing medical treatment or whether she is taking medication for any condition.  Therefore, the Court determines that Appellants must generate a "formal or informal" request containing specific requests for information, to which the SIF is obligated to respond.  *Porter*, 374 B.R. at 483.  The procedure for this exchange, as well as an assessment of the burden on the SIF and/or any privacy considerations relevant to Dawn Wilson, is left to the discretion of the Bankruptcy Court.

Finally, Appellants claim that they have been unable to ascertain whether there exist any "agreements or proposals by the SIF and the claimant to settle the claim set forth in the [Proof of Claim], which could significantly reduce the amount of the SIF's claim.  Doc. 10 at 12.   So that Appellants may "investigate fully" the SIF's claim and "raise every viable claim or defense," the Court determines that they are entitled to more information on any settlement agreements and proposals relating to the amount of the SIF's claim if this request is sufficiently specific.  *Shank*, 315 B.R. at 815.   In line with the findings *supra*, the Court determines that this request is sufficiently targeted if it is not, in the discretion of the Bankruptcy Court, unduly burdensome to the SIF.  Accordingly, Appellants are entitled to a reasonable production of additional information on any settlement agreements and proposals between the SIF and the Hawkins Dependents relating to the amount of the SIF's claim.

      iii.  <u>The Court's Conclusion is Bolstered by the November 14, 2019 Entry of a Finding and Award</u>

The Court's conclusion that Appellants are entitled to further inquiry in the areas discussed in Section V.B.ii *supra* is strengthened by the November 14, 2019 Entry of a Finding and Award, on which Judge Manning hinged her February 7, 2020 Order Overruling Objection.  As discussed,

the February 7, 2020 Order Overruling Objection allows the SIF's Proof of Claim in the amount of $2,397,105.00, "conditioned upon the entry of a finding and award pursuant to Conn. Gen. Stat § 31-355(b)."  Doc. 1-1 at 5.  The reader would infer from the quoted wording that the Entry of a Finding and Award Pursuant to Connecticut General Statutes § 31-355(b) had not yet been entered: it was an event, in the seeming perception of the Bankruptcy Court, that lay in the future. Yet, this was not the case.  The Entry of a Finding and Award Pursuant to Connecticut General Statutes § 31-355(b) had issued on November 14, 2019.  However, there is no indication that Judge Manning was aware of this when she issued her February 7, 2020 Order Overruling Objection.

If (1) the November 14, 2019 Entry of a Finding and Award set the amount of the SIF's claim, as suggested during the November 12, 2019 Status Conference; and (2) the amount was in the range of the "probable" future indemnity benefits of $2,397,105.00, this would tend to strengthen the validity of that amount.  Yet, the November 14, 2019 Entry of a Finding and Award does not explicitly set a precise amount of any future indemnity benefits to which the Hawkins Dependents may be entitled.  It also does not directly support the $2,397,105.00 amount of the SIF's claim or many of the inputs the Court has authorized Appellants to investigate further.

For example, the November 14, 2019 Entry of a Finding and Award reiterates the statement in the May 13, 2015 Workers' Compensation Commission Order that Hawkins's compensation rate was $950.29.  Doc. 10-1 at A-89.  As discussed *supra*, $950.29 per week does not equate to $54,200.00 per year, which is what the SIF alleges Dawn Wilson was "currently receiving" at the time of the SIF's Proof of Claim.  *Id.* at A-04.  Similarly, the November 14, 2019 Entry of a Finding and Award reiterates the statement in the May 13, 2015 Workers' Compensation Commission Order that payments to the Hawkins Dependents should include "annual cost of living adjustments."  Doc. 10-1 at A-94.  However, as with the May 13, 2015 Workers' Compensation

Commission Order, the November 14, 2019 Entry of a Finding and Award does not specify 2% as the escalation rate.  In sum, the fact that the November 14, 2019 Entry of a Finding and Award does not directly support the amount of the SIF's claim (or the figures that go into calculating the SIF's claim) weighs in favor of allowing Appellants the opportunity to further investigate the underlying facts.

   **C.** **Assuming without Deciding that the Proof of Claim Constituted *Prime Facie* Evidence of the Validity and Amount of the SIF's Claim, Appellants' Present Value Exhibits Shifted the Burden to the SIF to Satisfy Its Ultimate Burden of Persuasion Regarding the Amount of the Claim**

   As discussed in Section V.B *supra*, the Court does not determine whether the SIF's Proof of Claim constitutes *prima facie* evidence as to the validity and the amount of the SIF's claim. However, assuming without deciding that the Proof of Claim *does* constitute *prima facie* evidence of the SIF's claim, the Court finds that the Present Value Exhibits were evidence of the alleged excessiveness of the $2,397,105.00 amount in the SIF's Proof of Claim.  This shifts the burden of proof back to the SIF, which retains the ultimate burden of persuasion regarding the amount of its claim, including the fact that the amount of the claim is not discounted to present value.

   "To overcome . . . *prima facie* evidence, the objecting party must come forth with evidence which, if believed, would refute at least one of the allegations essential to the claim." *Sherman v. Novak (In re Reilly),* 245 B.R. 768, 773 (2d Cir. BAP 2000) (citing *In re Allegheny Int'l, Inc.*, 954 F.2d 167 (3d Cir.1992)).  If the proof of claim constitutes *prima facie* evidence as to the claim's validity and amount, it is "strong enough to carry over a mere formal objection without more."  *In re Holm*, 931 F.2d at 623; *see also DeGeorge Fin. Corp.*, 2002 WL 31096716, at *4 ("The "interposition of an objection does not deprive the proof of claim of presumptive validity unless the objection is supported by substantial evidence.") (quoting *In re Hemingway Transp., Inc.,* 993 F.2d 915, 925 (1st Cir.1993)).  That is, "[u]nless an objector introduces evidence as to the invalidity

of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim." 4 Collier on Bankruptcy ¶ 502.03[3][e] (16th ed. 2022).

"If the objecting party meets these evidentiary requirements, then the burden of going forward with the evidence shifts back to the claimant to sustain its ultimate burden of persuasion to establish the validity and amount of the claim by a preponderance of the evidence." *Porter*, 374 B.R. at 480; *see also In re Consumers Realty & Development Co.*, 238 B.R. 418, 423 (8th Cir. BAP 1999; *Live Primary*, 626 B.R. at 188 ("[T]he party objecting to . . . a claim has the initial burden of going forward with evidence to refute the claim even though the creditor retains the ultimate burden of persuasion with regard to the validity of the claim.").

The Court determines that the two Present Value Exhibits, which Appellants attached to their Bankruptcy Proceeding Reply, constituted evidence against an essential allegation in the SIF's Proof of Claim: the amount. Specifically, the Present Value Exhibits, if they are believed, may weigh in favor of the excessiveness of this amount, which, based on the SIF's Proof of Claim is "NOT discounted to present value." Doc. 10-1 at A-04. As discussed *supra* in Section I.E, these exhibits use a WCRA Present Value Calculator to purportedly demonstrate that, even assuming a yearly payment of $54,200.00 and a 32-year lifespan, the SIF's $2,397,105.00 amount would be reduced significantly if it were discounted to present value as of the Petition Date. Exhibit C applies a discount rate of 10% (along with an escalation rate of 0%) to determine that the $2,397,105.00 amount would be diminished to $541,241.00. *Id.* at A-49. Exhibit D applies a discount rate of 8% (along with an escalation rate of 0%) to determine that the $2,397,105.00 amount would be diminished to $643,775.00. *Id.* at A-50.

There is no indication in the record that Judge Manning considered the Present Value Exhibits. Moreover, as discussed *supra*, Judge Manning did not address Appellants' claim,

asserted in both the Bankruptcy Proceeding Objection and Appellants' Bankruptcy Proceeding Reply, that the $2,397,105.00 amount in the SIF's Proof of Claim was excessive because it was not discounted to present value.  The Court makes no ruling as to the *relative* weight of the Present Value Exhibits (on the one hand) against the SIF's Proof of Claim and any evidence the SIF may bring to satisfy its ultimate burden of persuasion (on the other hand).  This is for the Bankruptcy Court to determine in the first instance.[5]  Here, this Court determines only that the Present Value Exhibits amount to more than a "mere formal objection without more" such that the SIF must sustain its ultimate burden of persuasion to establish the amount of the claim by a preponderance of the evidence.  *In re Holm*, 931 F.2d at 623.

Appellants argue that "the Bankruptcy Court was *required* but failed to discount to present value [as of the Petition Date the] SIF's claim to future payments."  Doc. 10 at 11.  To decide this appeal, the Court need not endorse this principle as a general rule.  As discussed *supra*, the Court merely finds that, in this particular case, Appellants' submission of the Present Value Exhibits necessitates further inquiry into the amount asserted in the SIF's Proof of Claim under the applicable burden shifting framework.  Moreover, the Court does not decide whether or how present value discounting should ultimately apply in this case. "Debtors, creditors, and courts must determine if discounting is appropriate . . . and, if so, what discount rate or rates should be applied, to ensure that the . . . value available in a debtor's estate is allocated properly among unsecured

---

[5]    Although the Court does not opine on the ultimate outcome of the Bankruptcy Court's weighing of evidence, it notes that the Present Value Exhibits may excessively reduce the amount of the SIF's claim by applying an escalation rate of 0%.  The November 14, 2019 Entry of a Finding and Award directed the Treasurer for the State of Connecticut to make payments from the Second Injury Fund "for weekly benefits separately in equal amounts *with annual cost of living adjustments*."  As discussed in Section V.B *supra*, the November 14, 2019 Entry of a Finding and Award did not specify the rate of these adjustments.  However, this language suggests that *some* escalation rate greater than 0% should be an input into the amount of the SIF's claim.

creditors and other parties in interest." 17 J. Bankr. L. & Prac. 1 Art. 2. The Court determines that this inquiry is suited to the discretion of the Bankruptcy Court.

### D. The Court Remands this Case to the Bankruptcy Court for Further Proceedings Consistent with this Ruling

In sum, the Court first concludes that, regardless of whether the Proof of Claim constitutes *prima facie* evidence of the validity and amount of the SIF's claim, Appellants are entitled to further inquiry and taking of evidence for the purposes described in Section V.B *supra*. Second, assuming but not deciding that the Proof of Claim constitutes *prima facie* evidence of the SIF's claim, Appellants have shifted the burden of proof to the SIF, which must meet its burden of persuasion regarding its lack of present value discounting. *See* Section V.C. Therefore, the Court remands this case to the Bankruptcy Court for further proceedings consistent with this Ruling, the Bankruptcy Code, and the Federal Rules of Bankruptcy Procedure. Whether, at the conclusion of these further proceedings, the SIF's claim should be allowed is for the Bankruptcy Court to consider in the first instance.

The February 7, 2020 Order Overruling Objection notes that the SIF "asserts that the Debtor does not have standing to object to its claim. Because the objection to the Proof of Claim is overruled and the claim of [the] Second Injury Fund is allowed on the merits, the issue of standing does not need to be addressed." Doc. 1-1 at 2 n.1. In the present appeal, the Parties do not dispute Debtor Hopkins's standing to object to the SIF's claim. Accordingly, this Court has not addressed that issue in this Ruling. However, to the extent that the Bankruptcy Court must consider this threshold issue to afford Appellants the opportunities of further inquiry and taking of evidence, the Bankruptcy Court is directed to resolve the issue of Debtor Hopkins's standing.

**VI.      CONCLUSION**

For the foregoing reasons, the February 7, 2020 Order Overruling Objection is AFFIRMED

IN PART and REVERSED IN PART, and the case is REMANDED to the Bankruptcy Court.

The Court makes the following Order:

1.   Insofar as the February 7, 2020 Order Overruling Objection held that the Second Injury

     Fund is a "governmental unit" within the meaning of 11 U.S.C. § 101(27), this holding

     is AFFIRMED.

2.   Insofar as the February 7, 2020 Order Overruling Objection deemed the SIF's claim an

     allowed general secured claim in the amount of $2,397,105.000, this ruling is

     REVERSED, and the case is REMANDED to the Bankruptcy Court for further

     proceedings consistent with this Ruling.

The Clerk of Court is directed to close this file.

It is SO ORDERED.

Dated:   New Haven, Connecticut
         April 26, 2022

                                                    /s/ Charles S. Haight, Jr.
                                                    CHARLES S. HAIGHT, JR.
                                                    Senisor United States District Judge